No. 80.—-Daniel Hightower, plaintiff in error, *vs.* Dozier Thornton and others, defendants.

[1.] At Common Law, upon the dissolution of a corporation, the debts due to and from it are extinguished.

[2.] The individuals who compose a corporation, (and a corporation aggregate is nothing more than an association of individuals,) may, by *contract* or *in law*, incur liabilities, during its existence, which will survive the charter.

[3.] Unpaid subscriptions to the capital stock of a company, are corporate property, which can be reached by the creditors in a Court of Equity, and this right exists entirely independent of any statutory provision.

[4.] A Court of Equity will provide a remedy to enable the creditors to appropriate this trust fund.

[5.] The doctrine of Dr. *Salmon's* case, (1 *Cases in Ch.* 204,) questioned.

[6.] Legislative Acts, as well as the decrees of Courts of late years, evince a sounder and purer morality, with regard to the liability of moneyed corporations.

[7.] It is the amount of shares *subscribed*, and not the sums *actually paid in*, which constitutes the *capital stock* of a company.

[8.] The subscription for stock, is a debt which the corporation may call in to satisfy the creditors.

[9.] The equity of the creditor is equally strong where the stockholder has contracted to pay—but failed to do so—his portion of the capital stock, as where it has been paid in and afterwards withdrawn.

[10.] The right to have the *unpaid stock* called in to extinguish outstanding debts, is as clear and strong *after* as *before* the dissolution of the corporation.

[11.] It has been held in South Carolina, that the stockholders can be made liable to the creditors beyond the amount of their capital stock, unless their liability is restricted by the charter.

[12.] A distinction attempted to be taken between the liability of moneyed corporations and rail-road and manufacturing companies, none in reality exists; if any difference, *against* the *former*.

[13.] A periodical madness seems to pervade every section of the country in the business of banking, leading, necessarily, to *over issues* and consequent *depreciation.* It is the duty of the government to guard against this mischief; and the regulations provided by law for this purpose, instead of being relaxed, should be rigidly enforced by the Courts.

[14.] The provision in this and other charters, for the forfeiture of stock, is for the *benefit* of the *corporation* to coerce punctuality in the payment of instalments, and in case of failure, to afford to the company a speedy method of converting the stock into cash; and was not intended as a *privilege* to the *stockholder* to abandon his subscription.

[15.] The power to sell the stock of a delinquent stockholder is a *cumulative* remedy, and does not impair the right to compel payment by action.

[16.] This being a case of direct and purely technical trust, not cognizable at law, but falling within the proper, peculiar and exclusive jurisdiction of a Court of Equity, is not subject to the Statute of Limitations.

[17.] On a motion to dismiss a bill for *want of equity*, the question as to *parties* does not legitimately arise.

[18.] Lord *Hardwick* is reported to have said, that a bill will never be dismissed for want of parties; and this is true, provided the necessary parties can be made; and leave will be granted to make new parties, either by an amendment or a supplemental bill.

[19.] If it is apparent that parties cannot be made, and there can be no decree without them, the bill will be dismissed.

[20.] The Legislature having recognized and ratified the appointment of a receiver or assignee, made by the stockholders before the forfeiture of their charter, the duty of calling in the *unpaid stock* to discharge debts, devolves properly upon the trustee.

[21.] If the trustee fraudulently combining with the stockholders, neglects or refuses to do his duty, the proceeding may be maintained directly by the creditor in his own name against the stockholders, making the receiver a party defendant to the case.

In Equity, in Muscogee Superior Court. Decision by Judge ALEXANDER, May Term, 1850.

The bill in this case was filed by Daniel Hightower, alleging that he was a judgment creditor of the Planters & Mechanics'

Bank of Columbus, and that his *fi. fa.* had been returned by the Sheriff, with the entry of *"nulla bona"* thereon ; that the original stock subscribed was one million of dollars in shares of $100 each ; that only $25 on the share had ever been paid in by the stockholders, the directors being stockholders and fraudulently refusing to call in any further payments on the stock, and in fact rescinding orders previously passed, requiring an assessment on the stock to be paid in. The bill alleged, that the bank was totally insolvent, and that under the decree of the Superior Court of Muscogee County, the charter had been forfeited. The prayer was, that the stockholders of the bank should be decreed to pay into Court such sums as should be sufficient to discharge the demand of complainant.

When the cause was called for trial at May Term, 1850, both parties having announced themselves ready, the defendants' counsel moved to dismiss the bill for want of equity.

The Court granted the motion, and this decision is the error assigned in this case.

W. Dougherty, for plaintiff in error, contended—

1. That the capital stock of a bank is a trust fund for the payment of its debts, and may be pursued into the hands of any one who is not a *bona fide* purchaser. 2 *Story's Eq.* §1252. *Angel & Ames,* 540 *to* 546. *Wood vs. Dummer,* 3 *Mason,* 308. 1 *Kid on Corp.* 273. *Briggs vs. Penniman,* 8 *Cowen,* 387. *Slee vs. Bloom,* 19 *John.* 456. *Haslet vs. Witherspoon,* 2 *Richardson's Eq Rep.* 395. *Allen vs. Montgomery and West Point Rail Road,* 11 *Ala.* 437. *J. Caldwell vs. Montgomery and Wife,* 106 *Talbotton Pamphlet—Statute Limitations. Thomas vs. Brinefield,* 7 *Ga. Rep.* 154.

2. That the capital stock of a bank, and the value thereof, is regulated by charter, and that subscribed for and agreed to be paid, is the capital stock. *Prince's Digest,* 125. *Angel & Ames,* 562. *Briggs vs. Penniman,* 8 *Cowen,* 395. Opinion of *Spencer Senator, Allen vs. Montgomery and West Point Rail Road,* 11 *Ala.* 437. 1 *Vide, Sanford's Ch. Rep.* 305. *Vose vs. Grant,* 16 *Mass.* 476. That in Equity, the contracts of a corporation are not extinguished by dissolution, but survive, and the creditor may pursue the property of the corporation wherever found. 2 *Story's*

*Eq.* §1252.	*Wood vs. Dummer,* 3 *Mason,* 308.	*Nevitt vs. Bank of Port Gibson,* 6 *Smede & Marshall,* 557.	*Mumma vs. Potomac Company,* 8 *Peters,* 281.	*Vose vs. Grant,* 15 *Mass.* 505, 517 *and* 522.	*Spear vs. Grant,* 16 *Mass.* 9 *and* 15.	*Bleakney vs. Farm. & Mechanics'* *Bank of Greencastle,* 17 *Serg. & Rawle,* 65.	*Lindell vs. Benton & Kenedy,* 6 *Miss.* 364.	That when the rights of a party plaintiff depend upon the facts, that an assignment was made by a bank, he must prove them, notwithstanding they are recited in a public Act of the Legislature.	*Dougherty vs. Bethune,* 7 *Ga. Rep.* 90.

H. HOLT and STURGES, for defendant in error, insisted—

1st. That the complainant shows by his own bill, that at the time he dealt with said bank and became one of its *depositors,* its charter had been violated, and proceedings had been sued out and were pending for the forfeiture thereof. Of this, he had notice both by *lis pendens* and public law.

The principle is without controversy, that if one deal with an agent, himself having knowledge of his want of authority, or that he is maladministering the affairs of his principal or transcending the limits of his authority, the principal is not thereby bound. *Paley on Agency,* 200.	*Story on Agency, page* 546, 622, §§442, 482.	1 *Esp. Reps.* 290.	*Cowen and others vs. Simpson,* 14 *Mass. R.* 58, *Wyman vs. Hallowell and Augusta Bank.*	2 *Mason's R.* 3.	*Bellows vs. the same.*	4 *Smede & Marsh.* 312, *Lake et al. vs. Mumford.*	1 *Speer's R.* 433, *State vs. Bank of South Carolina.* 17 *Mass.* 28, *Salem Bank vs. Gloucester Bank.*	1 *Kelly,* 27.	13 *Ohio,* 12, 269.	1 *Sup. to U. S. D.* 436.	7 *Ga. S. C.* 80.	10 *Metcalf,* 325, 369.	2 *Sup. to U. S. D.* 91.

2d. Said bill is defective, for the want of proper parties.

1. It is a creditor's bill, and by an individual creditor, showing upon its face that there are other creditors, without showing who they are or the amount of their claims.

2. It shows that there are other parties (stockholders,) alike liable with the defendants sued, and alleges no sufficient reasons and excuses why they are not made parties.

3. If the complainant can be excused from making other parties complainants and defendants, then we insist that the names of the omitted parties, the amount of their claims and the extent of

their liability, &c. should have been set forth. 2 *Story's Eq.* §1526. 2 *Mason's Reps.* 190, 6, *West vs. Randall et al.* 4 *Ga. Sup. Ct.* 586, *Rice vs. Tarver et al.* 5 *Ga. Sup. Ct.* 28, *Wells et al. vs. Strange.* 6 *Ga. Sup. Ct.* 468, *Smith & Shorter vs. Mitchell.* 7 *Ga. Sup. Ct.* 98, *Carter et al. vs. McDougald et al.*

3d. The demand of the complainant had its origin in a certificate of deposition, and now exists in a judgment rendered thereon. The stockholders (as such) are not and never were liable for either of such demands. *Prince's Dig.* 127, '8. 1 *Kelly,* 435, *Collins vs. Central Bank et al.* 1 *Kelly,* 461, *Bullard vs. Central Bank. Angel & Ames on Cor.* 546. 14 *Mass.* 58, *supra.* 4 *Sm. & Marsh,* 312, *supra.*

4th. Admitting the existence and legal effect of the Act of incorporation at the filing of the complainant's bill, then we insist—

1st. That none but the board of directors had authority to call *for instalments* upon stock.

2d. That they could only make such calls in terms of and in the manner pointed out in the Act of incorporation.

3d. If the complainant, or any other than the board of directors, could make such calls, it could only be done in the manner and according to the form provided and fixed in the charter. *Prince's Dig.* 125. 8 *Cowen,* 387, *Briggs vs. Pennyman, Spencer, J.* 5 *Mass.* 491, *Gilmore vs. Pope.* See also, 10 *Mass.* 334. 14 *J. R.* 238, *Dutchess Cot. Man. vs. Davis.* 3 *Ala. Rep.* 666. 5 *Ala. Rep.* 403. 11 *Ala. Rep.* 472.

5th. A judgment of forfeiture, without condition or saving, is alleged to have been rendered. Then, *no demand* remains to the complainant, and no liability rests upon the defendants. *Angel & Ames on Cor.* 750. 2 *Kent's Com.* 305 *to* 315. 3 *Burrows' R.* 1866, *Colchular Cor. vs. Seaber.* 3 *T. R.* 199, *The King vs. Passmore.* 3 *Smede & Marsh.* 791, *Bank of Miss. vs. Wren.* 8 *Pet. Rep.* 281, *Mumma vs. The Potomac Co.* 10 *Paige's Ch. R.* 541, *W. & J. James vs. Woodruff et al. Angel & Ames on Cor.* 482, §8, 493, §14. 7 *Ga. S. C.* 80. 13 *Ohio.* 10 *Met.* 6 *S. & M. sup.*

6th. The fifth proposition assumes, as the bill alleges, that the judgment of forfeiture is absolute and without condition or saving, and it is in fact so rendered. It may, however, enter into the consideration of this Court to enquire how far the consequences of the forfeiture are saved by the Acts of the Legislature, pro-

viding for its rendition and fixing the rights, liabilities and remedies of debtors, creditors and stockholders. We insist—

1st. That by their provisions and savings, no right remains or is saved to the complainant to sue.

2d. That no duty or obligation rests on the defendants in this or any proceeding, either in a Court of Law or Chancery, to answer his demand. *Prince's Dig.* 125, '6, '7. *Pamphlet Acts*, 1840 —27, 1841—29, 1842—29, 1843—21. 5 *Ga. Sup. Ct. Reps.* 239, *Hall et al. vs. Cary, assignee.* 2 *McMullen*, 439, *State vs. Bank of Charleston.* 6 *Ala. Reps.* 289, *Crawford vs. Planters & Mech. Bank.* 8 *Peters*, 281, *supra.* 1 *Kelly*, 27. 7 *Ga. S. C.* 80, *supra.*

7th. We insist upon the Statute of Limitations, as a bar to the complainant's rights, if any otherwise would remain to him. Is it replied that it is a trust fund in the hands of the defendants, which the complainant is seeking to pursue? When did the relation of trustee and *cestui que trust* happen, and when did it cease to exist? When did their interest become adverse? *Angel & Ames on Cor.* 556. 19 *J. R.* 477, *Slee vs. Bloom.* 8 *Cowen*, 391, *Briggs vs. Perryman.* 2 *Story's Eq.* §1521 *a*, page 989. 5 *Ga. Sup. Ct.* 486, *Dickman vs. McCamy.* 8 *Ga. Sup. Ct.* 1, *Pendergrast et al. vs. Foley, adm'r.* Ibid, 97, *Keaton vs. Greenwood.* 2 *McMullen*, 439, *supra.* 1 *Speers*, 433, *supra.* 1 *Kelly*, 27. 7 *Ga. S. C.* 80, *supra.*

8th. If the defendants are liable, it is upon a promise or contract to pay, express or implied. To pay whom and when? As between them and the complainant, no promise or consideration has passed. 5 *Mass. R.* 491, *Gilmore vs. Pope.* 10 *Ibid*, 334, *supra.* 14 *J. R.* 238, *supra.*

9th. The complainant is seeking the recovery of a demand against an insolvent corporation, and taking his own allegations most strongly against himself, it was so when he acquired his demand. He should, therefore, have shown by his bill, to entitle him to any relief, when, how and at what cost he acquired his demand, as he is only entitled to recover so much as, and no more than it cost him. 1 *Kelly*, 435, 461. 6 *Paige's Ch. R.* 486.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The case made by this record is simply this: A judgment creditor of the late Planters & Mechanics' Bank of Columbus, having

prosecuted his claim against the corporation to *insolvency,* filed his bill, alleging that the corporation was dissolved, both in *fact* and in *form,* and praying that the stockholders of the bank, who, it was averred, had paid only twenty-five dollars on the share—the capital stock being one million, in shares of one hundred dollars each—might be decreed to pay into Court such sums on their *unpaid stock* as should be sufficient to discharge the complainant's demand.

Are these unpaid subscriptions corporate property, and can they be reached by the creditors in a Court of Equity?

[1.] Upon the threshhold of this discussion, we are met with the Common Law principle—that upon the dissolution of a corporation, the debts due to and from it are extinguished. A doctrine which results, necessarily, from the fact, that the corporation having expired, whether by its own limitation, by surrender, abandonment of its members or judgment of dissolution, there is no one in law to sue or be sued.

[2.] But it does not follow, that the individuals who composed this corporation, (and corporations, aggregate, are but associations of individuals,) may not, by *contract* or *in law,* have incurred liabilities which will survive their charter, and which will be enforced at Law or in Equity, according to the circumstances of the case. In the case of *Lane* and *Morris,* just decided, the liability was *by contract,* and a common action of debt, as provided for by the charter, was found to be an ample remedy.

[3.] Here the liability is *equitable* only, resulting from the undertaking of the defendant to the corporation—that he would subscribe so much to the capital stock of the company. After having acquired credit and contracted debts, upon the faith of this subscription, the company has failed, and its franchise been seized into the hands of the State, upon *quo warranto.* Will not the party be bound in Equity to fulfil his promise?

[4.] And will not a Court of Equity provide a remedy to compel him to perform his just obligations, notwithstanding the dissolution of the corporation?

When, upon *quo warranto,* the franchise of the City of London was recalled by the King, their right to sue as a corporation ceased; but their liabilities, in the capacity they had sustained, were not extinguished. 8 *St. Trials,* 1087.

Judge *Story,* in treating of *implied trusts,* says, that to this head

Hightower *vs.* Thornton and others.

may be referred that class of cases, where *the stock,* and other property of private corporations, is deemed a *trust fund,* for the payment of the debts of the corporation. So, that the *creditors* have a lien or right of priority of payment on it, in preference to any of the stockholders in the corporation. Therefore, if the corporation is dissolved, the contracts of such corporation are not thereby deemed extinguished; *but they survive the dissolution of the corporation,* and the creditors may enforce their claims against any property belonging to the corporation, which has not passed into the hands of a *bona fide* purchaser; for such property will be held affected with a trust, *primarily* for the creditors of the company, and subject to their right, *secondarily* for the stockholders, in proportion to their interest therein. *Upon the like ground, the capital stock of an incorporated bank is deemed a trust fund for all the debts of the corporation.* 2 *Stor. Eq. Jur.* §1252.

We have, then, the authority of this great Judge, for holding that the *capital stock* of *this bank* is deemed a *trust fund,* for the payment of complainant's demand. What constitutes the *capital stock* of this corporation, we shall see hereafter.

[5.] I shall pass over the English adjudications upon this subject, and especially the leading case of Dr. *Salmon vs. The Hamborough Company,* (1 *Cases in Chancery,* 204,) not because I do not believe that the doctrines which it contains are in perfect accordance with the well established principles of law and equity, but because doubt has been expressed as to the authority of this case. 1 *Fonb. Eq.* 297, *note.* And I desire that the equity jurisdiction, which is here sought to be maintained, may rest upon a foundation that cannot be shaken. Sufficient to say, then, that in the *professional* opinion of Chancellor *Kent,* read on the argument of *Nevitt vs. Bank of Port Gibson,* (6 *Smede & Marsh.* 513,) he asserts that there is not an instance in the *English* law, in which the funds of an insolvent or forfeited moneyed institution, have been permitted to be abandoned, and creditors denied redress and payment out of them; and he adds—that to permit the odious and obsolete doctrine of ancient date, before moneyed institutions were introduced, to be now applied to the dissolution of a bank, perhaps by its own mismanagement and abuse, so that all its assets were to be considered as dispersed to the wind, without any owner or power any where to collect and justly apply them, *would be a disgrace to any civilized State.*

[6.] But this, he says, cannot take place, inasmuch as the improved and enlightened administration of equity jurisprudence, in every part of the country, has taught and established sounder and juster doctrines; and that this is apparent in the legislative Acts and in the decrees of Courts of Equity, relative to insolvent and dissolved moneyed charters.

I might have forborne to introduce this opinion, had it not been that the views which it inculcates were fully sustained and sanctioned by the "upright, firm and enlightened" tribunal to which it was addressed.

In *Vose vs. Grant*, (15 *Mass. R.* 505,) Judge *Jackson* expressed the opinion, that the creditors of a joint stock company would have an adequate remedy in a Court of Equity, against the individuals who had composed it.

[7.] In *Spear vs. Grant*, (16 *Mass. R.* 9,) the Court admitted that the stock actually vested, should be considered as pledged for the payment of the debts of the corporation, as far as it would go, and that if it was withdrawn before the debts were discharged, that there would be an equitable obligation on the part of the stockholders, to account for so much *as they originally consented to subscribe*. But Mr. Chief Justice *Parker*, who gave the opinion of the Court, was unable to discover any adequate mode at *Common Law*, by which a creditor could compel any stockholder to pay him the amount of his stock; and that the remedy, if any there was, would be before a tribunal which was empowered to act upon the whole subject matter in an *equitable* point of view.

In the case of *Wood vs. Dummer*, (3 *Mason's Rep.* 308,) the plaintiff, as holder of the notes of the Hallowell and Augusta Bank, brought a bill in Equity, in the Circuit Court of the United States, before Mr. Justice *Story*, against the stockholders of the bank. The learned Judge sustained the bill, and founded the decree of the Court upon the liabilities assumed by the several stockholders, *in their subscription to the capital stock*. The bill alleged the insolvency of the bank and the withdrawal of its funds by the stockholders. The Court, however, proceeded upon the principle, *that the capital stock was a trust fund,* and that the stockholders, both in law and in fact, were affected with notice of the trust, and the foundation of the decree, was the agreement of the stockholders *to pay the sums they had respectively subscribed to the capital stock.* This agreement was with the corporation, which

was liable in the *first instance,* and the creditors had a right to claim, that as against the individual members, *their equities should be worked out through the corporation.*

In *Briggs vs. Penniman,* (8 *Cowen,* 387,) it was held by the Court of Errors of the State New York, *that the stock subscribed and agreed to be paid into the company, became corporate property,* and when paid in, might be reached by ordinary proceedings; *and if not paid in, a Court of Equity would compel the trustees to collect and apply it to the payment of debts.*

The same principle was acted upon in *Slee vs. Bloom,* (19 *Wheat. Rep.* 456,) in which the stockholders were required, in the first instance, to pay up the amount of their subscriptions, for the benefit of the creditors—that this, being corporate property, is a fund, say the Court, for the benefit of creditors, *existing entirely independent of any statutory provision.*

[8.] An Act of the State of Connecticut, incorporating a manufacturing company, provided that the capital stock of the corporation should not exceed $50,000—that a share of the stock should be $100—that the directors might call in the subscriptions to the capital stock by instalment, in such proportions and at such times and places as they should think proper—that within three months, not less than $5,000 of the capital stock should be actually paid.   There is a most striking resemblance between the provisions of this charter and that under consideration, as well as the facts of the two cases.

After the stockholders had paid in 40 *per cent.* on their subscriptions, the corporation became insolvent, having no visible property; and on a bill in Chancery, brought by certain creditors, praying that they might be compelled to pay in the remaining 60 *per cent.* (or so much thereof as should be necessary,) to be applied to the payment of the debts, it was held—

1. That the obligations which the stockholders assumed, *by their subscription to the capital stock of the corporation,* was to pay the sum of one hundred dollars on each share, in such instalments and at such times as should be required by the stockholders.

2. That *the amount of the shares subscribed, and not the sum actually paid in, constituted the capital stock of the corporation.*

3. That when further instalments became necessary to meet the debts of the corporation, it was the duty of the directors to

cause them to be made—the discretionary power of the directors being *modal* only, relating to the time and manner of payment.

4. *That the duty might be enforced by a decree in Chancery.*

*Waite*, J. in delivering the opinion of the Court, says : "Does the amount of shares *subscribed*, constitute the capital stock of the company, or only the amount actually *paid in ?*   Had these plaintiffs, when they dealt with the company and gave them credit, a right to look to the *former* as a fund applicable to the payment of their debts, or only to the *latter?*

"The *unpaid balances* of the shares are as much subject to the call of the directors, as any debts due the company.   Payment can as well be enforced in the one case as in the other.   The directors can at any time collect these balances, and if sufficient, pay off the debts due the plaintiffs.   And why should they not do it ?   What justice is there in withholding funds at their command and applicable to the payment of these debts ?   It is apparent that it is not for their interest to do it.   The charter requires them to be *stockholders*, and the bill alleges that they are such, and actually own a large amount of the shares of the company.   A call upon the stockholders for funds to pay off these debts of this insolvent company, would be, in part, a call upon themselves, and might materially affect their own interests.   They may, therefore, prefer to let these creditors suffer, rather than become sufferers themselves.

"It is true, the company was incorporated, and the members were not made liable, in their individual capacities, for the debts of the company ; but it was necessary for the company to create a capital before they could obtain credit.   *This was done by the subscriptions to the capital stock ;* and all that is required of the defendants in the present case is, that the members shall discharge the obligations which they assumed upon becoming stockholders, or at least so much as may be necessary to pay off the debts of the company."

The charter of the Planters and Mechanics' Bank declares, that "the stock of the company shall consist of one million of dollars, in shares of $100 each, and the stockholders are required to pay in 25 *per cent.* on the amount of their *capital stock*, in specie, before the board of directors shall be permitted to issue their bank notes and *the remainder of their subscription*, in such sums and at such times as the board of directors shall require." *Prince*, 125.

In New York, on the formation of the Mohawk Insurance Company, the directors resolved to reserve a majority of the stock for themselves. Each director subscribed for 1042 shares, and gave a promissory note for the amount. The defendant, *Whitlock,* was one of these directors, giving his note in $20,840 for 1042 shares. The company became embarrassed, and Whitlock induced the President, John D. Brown, in consideration of $6,000, to stand in his place for the shares. This was done without any sanction of the company. Brown gave up (from the company's effects,) to Whitlock, his note for the $20,840, and substituted his own, and had the 1042 shares of stock placed in his (Brown's) name. Brown was at this time insolvent. This was held to be a fraud upon the creditors of the company, and that Whitlock should make good the amount of his note for $20,840. Vice Chancellor *McCoun* said, *that he could not bring his mind to any other conclusion than that the defendant was liable and bound to make good the stock which he subscribed for in the company on its organization,* and for which he gave his note in the sum of twenty thousand, eight hundred and forty dollars. 3 *Edw. Ch. Rep.* 215. And this decree was affirmed by the Chancellor. 9 *Paige,* 152.

In *Allen et al. vs. Montgomery Rail Road Co. et al.* (11 *Ala. Rep. N. S.* 437,) the Court ask, " has, then, a Court of Equity the authority *to reach subscriptions for stocks to satisfy a creditor,* when there is a deficiency of legal assets, in the absence of any call by the corporotion upon its stockholders ? That it has, is, we think, a clear position, as well on principle as authority. As the individual corporators are not, themselves, personally responsible for the contracts of the corporation, there is no responsibility any where, if the *capital stock* is not a fund answerable to the creditors ; and it would seem to make no difference *in the right,* whether this capital stock or fund existed in property or equitable assets ; nor can it vary the right, if the Legislature, instead of requiring the stock to be paid in, has permitted the corporation to call for it, as their necessities or the convenience of the stockholders may require. *In the latter case, the subscription is a debt which the corporation may call for;* and if the debts contracted are beyond the assets in hand, it would be most inequitable to neglect or refuse to make the call, so as to discharge the debt. It is on this obvious principle, that a Court of Equity assumes jurisdiction, and compels the corporation and stockholder to do that which

justice requires—*that is, to discharge the debt to the extent that the capital stock remains in the hands of the stockholder.*"

[9.] Counsel for the defendant in error have attempted to evade the force of the decision in *Wood vs. Dummer*, (3 *Mason*, 308,) by ingeniously suggesting that there the capital had been *paid in*, and after the dissolution of the corporation, it was again distributed among the stockholders, while the creditors remained unpaid; that, consequently, it was a mere question of priority of *lien* as between the *creditors* and the *stockholders*. But the Supreme Court of Alabama, in their notice of this case, very properly held, as we think, " that the equity of the creditor is equally strong where the stockholder has contracted to pay, but has never paid his portion of the capital stock." And the conclusion at which they arrive is, that the creditor has the right to pursue a stockholder, when there is an insufficiency of legal assets, although the corporation has made no calls.

[10.] It is true that in this case, there had been no judgment of forfeiture. But neither the Court, nor the counsel who argued it, seem to consider this fact, as distinguishing it from the case in *Mason* and others, which have been determined upon the same grounds, as in truth it does not. Precedents might be still further multiplied upon this point.

In *Nevitt vs. The Bank of Port Gibson*, (already referred to,) nearly all the learning on this subject was exhausted, it having been twice argued with singular diligence and ability. And there, as every where else, where the question has been raised, a majority of the Court held, that the property and debts due to and belonging to the bank was a trust fund, subject to the cognizance and control of a Court of Equity, for the benefit of creditors. It is true, that Mr. Justice *Thatcher*, for whose ability I entertain a profound and undissembled respect, did not concur, but delivered a dissenting opinion. But I must think that the legal world, with great unanimity, will hold, that the science of jurisprudence is deplorably defective, if the assets of a corporation, and among these the capital stock authorized to be invested, and to which the public looks with confidence for security and indemnity, cannot be rescued " as planks from the wreck," and saved for depositors, bill-holders and other creditors; and that although a corporation is dissolved, with or without legislative interference,

that a Court of Equity will devise a mode, for the purposes of the remedy, to hold the true parties to their just obligations.

[11.] The case of *Hume vs. The Winyaw and Wando Canal Company*, (*Carolina Law Journal, vol* 1, *p.* 217,) carries this doctrine much farther : Chancellor *Desaussure* was of the opinion that the individual corporators would be liable in Equity for debts contracted with their consent, *beyond the amount* of their *capital stock*, on the same principle that they are bound for their subscriptions to the capital, unless their liability is limited by the terms of the charter, as it may be, by express provision to that effect. And there are not wanting jurists of great respectability, who think that "no principle can be more equitable than this, and none more just." We decline, however, endorsing the doctrine to this extent, not caring to go beyond the case made by the record, to provoke a controversy with those who "fear there is a tendency in the judicial mind of the age, to seek first for the equity of the case, as it is termed, and then for the law to support it," which *complaint,* by the way, I take to be a merited compliment to the purer and more elevated morality which adorns the pages of modern jurisprudence. I am content, however, to abide by the equity " of the *Hardwicks,* the *Thurlows* and the *Eldons* of England—of the *Marshalls, the Washingtons* and the *Kents*" (and *Storys*) "of the United States—an equity without discretion, fixed as the principles of the Common Law, and like it, worthy of the freemen of whose fortunes it disposes."

It has been contended by one of the learned counsel for the defendant in error, that the amount *paid in* on the shares, and not the sum specified in the charter, constituted the *capital stock* of this bank. It will be perceived, however, that the Act itself has settled this question, designating as it does in so many words, the million of dollars authorized to be subscribed for, its *capital stock.*

Vice Chancellor *Sandford,* in *Barry vs. The Merchants' Exchange Company,* (1 *Sandf. Ch. R.* 280,) has given a definition of what is meant by the capital stock of a corporation. "It is," says he, "the aggregate amount of the funds of the corporation, which are combined together under a charter, for the attainment of some common object of public convenience or private utility. *The amount is usually fixed in the Act of incorporation,* although it is sometimes otherwise. It is thus limited in reference to the convenience of the intended corporators, and *for the information*

*and security of the public at large.* To the corporation, it prescribes the amount and subdivisions of their respective contributions to the common fund, the voice which each shall have in its control and management, and the apportionment of the profits of the enterprize. To the community, it announces the extent of the means contributed and forming the basis of the dealings of the corporate body, and enables every man to judge of its ability to meet its engagements and perform what it undertakes. And when, as in most instances, the Statute requires the stock to be paid in before the corporation can transact business, security to those contracting with it, is thereby superadded to the information of its resources. These objects, for the public benefit, are sometimes defeated by fraud and deception; but they are such as the Legislature have in view in limiting the amount of the *capital stock,* and requiring a specified sum or proportion to be paid in."

The capital stock of a corporation, like that of a limited partnership or joint stock company, under the Act of this State, of 1837, (*Hotchkiss,* 373,) is the amount fixed upon by the partners or associates as their stake in the concern. Upon this, they get credit and transact business. It may not all be actually *paid in,* still they are liable to the public for the amount thus fixed. Additions on the other hand may be made to the original stock, by a successful prosecution of the business; still these *profits* do not constitute *capital.*

[12.] But while it is conceded that this may be a sound exposition of the law, as applicable to rail road and manufacturing corporations, it is argued that it is otherwise as to banking companies; and the reason assigned is, that *they* do business only on the capital actually paid in, and moreover, that in this State, they publish by authority of law, for the information of the community, semi-annually, under oath, a true statement of their condition, which is notice to every body. The answer to this is, that the books make no such distinction; and when it is recollected, that this corporation, like most other banking institutions in this State, is permitted, expressly by its charter, to contract debts by bond, bill or other security, to *three* times the amount of the capital stock actually paid in, and over and above the specie deposited in its vaults for safe keeping, (*Prince,* 127,) it would seem that the principle upon which the complainant proposes to recover, would apply with peculiar force to these moneyed corporations. That

is to say, that if upon $250,000 paid in, the bank is authorized to contract liabilities to the amount of $750,000, if in any case Equity would decree that so much of the unpaid stock should be contributed, as was necessary to extinguish the liabilities of the corporation, it would be this. And does experience prove that *banks* are less likely to contract debts beyond their means, than other corporations?

[13.] On the contrary, their history demonstrates, that there is no business so liable to be *overdone,* because none which holds out more tempting prospects to grow suddenly rich—none has been managed in a more reckless and improvident manner. A periodical madness seems to pervade the Union upon this subject, from which none are exempt. "The cool and sagacious sons of New England—the impetuous and impulsive children of the South and the hardy and adventurous men of the West, have all performed the same circuit." Prudent and conscientious bankers (and there are many such among us) need not and will not complain of the checks thus thrown around their business. But be that as it may, any system of laws is essentially vicious, which allows *natural* or *artificial* persons to prey upon a credulous public, without let or hindrance. It is admitted that the country has sustained infinitely more injury from the circulation of worthless paper, than from the issue of spurious coin; and the financial abilities of the ablest statesmen have been tasked to the utmost to prevent a recurrence of the disasters produced from this cause in past years. At last the Legislatures of the several States, determining to protect those who were incapable of protecting themselves, have caused provisions to be inserted in modern charters, making each member, to a certain extent at least, *personally* liable, in his private estate, for the company debts; and the Courts, in some respects, have applied the principle of copartnership to private corporations. Due regard for the interest of the community, in my humble judgment, requires that those regulations and decisions, instead of being relaxed by the Courts, should be rigidly enforced. They would be recreant to their duty, in any wise to impair the security thus afforded, and perhaps the very best that could be devised against *over issues* or *depreciation.*

[14.] The third section of the charter declares, that "if there shall be a failure in the payment of any sum subscribed for by any person, copartnership or body politic, when the same is re-

quired to be paid by this Act, the share or shares upon which such failure shall happen or accrue, shall be, for such failure, forfeited, and may be again sold and disposed of in such manner as the directors shall order and provide, and the proceeds from such sale, together with the sum or sums which may have been paid thereon, shall revert to the benefit of said corporation." *Prince*, 125.

Now, it is argued, that a Court of Equity cannot coerce the contribution of the unpaid stock, because the stockholder has the right, under this clause in the charter, to abandon his shares altogether, even without the consent of the corporation, during its existence. We apprehend the law to be otherwise. This provision in the charter was inserted for the benefit of the corporation, and not of the stockholder. It was thought that this provision would coerce punctuality in paying the calls upon the stockholders, and if not, that it would secure to the company the speedy receipt of the money, by the sale of the stock.

[15.] And where the Statute, as here, gives to a corporation the power to sell the shares of a delinquent stockholder, the remedy is *cumulative*, and does not impair the right to compel payment by action. *Instone vs. Bridge Co.* 2 *Bibb*, 577. *Tar River Navigation Co. vs. Neal*, 3 *Hawks*, 520. *Highland Turn. Co. vs. McKean*, 11 *Johns. R.* 89. *Hartford & R. Co. vs. Small*, 12 *Conn. R.* 499. *Dutchess Cotton Man. Co. vs. Davis*, 14 *Ib.* 233. *Herkimer Man. & Hyd. Co. vs. Small*, 21 *Wend.* 273. *Troy Turn. & R. R. Co. vs. McChemey*, *Ib.* 296. *Bean vs. Cahawba, &c. R. R. Co.* 3 *Ala.* 660. *Selma and Tenn. R. R. Co. vs. Tipton*, 5 *Ib.* 787. *Gratz vs. Redd*, 4 *Mar.* 103. 1 *Binny*, 70. 4 *Ala.* 7. *Goshen Turn. Co. vs. Hustin*, 9 *Johns. Rep.* 217.

I would add, merely, that the decree to be rendered, can and should be so moulded as to give to the stockholders all the privileges to which they would have been entitled under the charter, had the stock been called in by the directors during the existence of the corporation.

[16.] As to the Statute of Limitations, it need only be said, that this is a case of a *direct* trust, purely technical, not cognizable at law, but falling within the proper, peculiar and exclusive jurisdiction of a Court of Equity; and, consequently, one not subject to the presumption of satisfaction or payment or waiver. 2 *Mylne & Keene*, 225. 4 *Mylne & Craig*, 52. 5 *Ves.* 485. *Sir*

Hightower *vs.* Thornton and others.

*G. Cooper*, 201. 1 *Cox*, 28, 34. 1 *Jacob & Walker*, 51. 17
*Ves.* 87. Not only is this claim *not subject* to the Statute of Lim-
itations, but the doctrine of *stale demand* does not apply to it;
for the bill was filed in five years after the liability accrued. The
right to go into Equity accrued from the time when the legal as-
sets of the corporation were exhausted; in other words, when
the complainant could no longer make his remedy against the
company available *at law.* The return of *nulla bona* on the exe-
cution is dated in April, 1843, and the bill was filed in April,
1848, just five years thereafter.

Our judgment then is, that there was equity in the complain-
ant's bill; that notwithstanding the dissolution of the corporation,
by a forfeiture of its franchises, the obligation of its contracts
survived, and that the creditors have a right to enforce their
claims against any property belonging to the corporation, which
has not passed into the hands of *bona fide* purchasers, and that
so much of the capital stock *originally subscribed* for, as remains
*unpaid*, is a *trust fund* for the payment of debts, subject to be
reached in a Court of Equity, and made available for this pur-
pose.

[17.] Finally, it is said that this bill was rightfully dismissed,
because the proper parties were not before the Court; that it
was a creditor's bill, showing upon its face that there were
other creditors, without stating who they were, or the amount of
their claims; that it was apparent, also, that there were other
stockholders alike liable with the defendant, and no sufficient rea-
son or excuse is alleged for not proceeding against them also;
and at any rate it is insisted, that if the names of the parties are
omitted, that the amount of their claims and the extent of their
liabilities should have been set forth, and that for lack of this in-
formation, no decree can be rendered—no relief afforded.

But that above all, if this Court should be of the opinion that
the Common Law consequences of the forfeiture of a charter
are saved in this case by the Acts of the Legislature of 1840,
1841, 1842 and 1843, providing for the rendition of the judg-
ment of forfeiture, and fixing the rights, liabilities and remedies
of debtors, creditors and stockholders, then it is most strenuously
urged, that by the provisions of these Statutes, there is no right
reserved to this complainant to sue, and no duty or obligation
resting on the defendant in this or any other proceeding, either

in a Court of Law or Chancery, *to answer his* demand; *that* these Acts provide a remedy for the creditors of the corporation, by recognising the *assignee* appointed by the bank, and clothing *him* with power and authority to proceed forthwith to the settlement, collection and payment of the debts due to and from said bank institution, according to the deed of assignment which it had made prior to the judgment of forfeiture; that to the extent that the creditors have rights, they must be enforced according to the Statutes which secures them ; and that for the Court to go beyond this, " is to *make* rather than to *administer* the law."

This bill, as the transcript shows, was dismissed *for want of equity*, and upon no other ground. It is obvious, therefore, that the question as to who are and who are not the proper parties to this proceeding, is one *dehors* the record. But suppose the motion had been to dismiss the bill for want of proper parties ? Would the Chancellor have granted it ? Most assuredly not, provided the necessary parties could have been made, and leave would have been given to make new parties, either by an amendment or by a supplemental bill. *Story's Eq. Pl.* §541.

[18.] It is reported to have been said by Lord *Hardwicke*, in an anonymous case, (2 *Atk.* 15,) and in *Jones vs. Jones*, (3 *Atk.* 111,) that a bill in Chancery is never dismissed for want of parties, but that it stands over on the payment of costs. *Ib. note.* And this no doubt is true, with this qualification, provided the necessary parties can be made.

[19.] For if it is apparent that this cannot be done, and there can be no decree without them, as is sometimes the case, the bill of course must be dismissed.

[20.] We entertain no doubt but that this proceeding could be maintained by a creditor directly in his own name, that the right exists independent of any statutory enactments. But the Legislature having ratified the appointment of the receiver in this case, on whom, as standing in the place of the directors, *pro hac vice,* this duty would legitimately devolve, of calling in the unpaid stock to satisfy the outstanding debts of the company, we think the suit should be prosecuted in his name, unless some sufficient excuse is rendered why it is not.

[21.] As that he has fraudulently combined with the stockholders, as the directors were charged with having done in the case cited from Connecticut, and as they are alleged to have done here

during the continuance of the charter, respecting the 5 *per cent.* instalment; or that he has failed or refused to take the proper steps to have this and the other demands due by the company extinguished out of the assets of the company. In such event, the assignee should be made a party defendant.

I am no enemy to corporations. On the contrary, I look upon them as the *proof,* and in no small degree, the *cause* of the unparalleled advancement of *modern* civilization. Without them, many of our most magnificent works of internal improvement, which confer such prosperity and glory upon the country, would never have been undertaken. I am the friend of banks, founded upon the only honest principle of banking—the certain ability to meet their obligations promptly and according to their tenor. I am the friend of the credit system, given as the encouragement to honest enterprize and industry. But when we remember that the losses to the country within a few years, by the failure of banks, exceeded four hundred millions of dollars, as appears from a report of a former Secretary of the Treasury, and that too before the great explosion which scattered such wide spread ruin, and brought so much dishonor upon the country, we feel it to be a most solemn duty to guard with vigilance those checks which are designed and so well calculated to secure for paper currency a substantial basis to rest upon.

Decree reversed and the cause remanded for proceedings in conformity with this opinion.