## Case No. 9,112.

### MARSH et al. v. BURROUGHS et al.

[1 Woods, 463;[1] 10 Am. Law Reg. (N. S.) 718.]

Circuit Court, S. D. Georgia. April Term, 1871.

CREDITOR'S BILL — CORPORATIONS — UNPAID SUB-SCRIPTIONS—JUDGMENT—WHEN CONCLUSIVE—CONSTITUTION OF STATE—HOW VIEWED.

1. A judgment creditor, who has exhausted his legal remedy by 'execution returned nulla bona, may alone, or with other judgment creditors, file a bill against persons holding property of the debtor, which on account of fraud, or the existence of a trust, cannot be reached by the execution.

[Cited in Thompson v. Reno Sav. Bank, 19 Nev. 103, 7 Pac. 72; Tatum v. Rosenthal, 95 Cal. 129, 30 Pac. 137.]

2. In case a fund can only be divided satisfactorily amongst a certain class of persons, it is necessary to frame the decree in such a manner as that all those persons may be brought in for their destributive shares; but even then the bill may often be filed by any one of them on his own behalf.

[Cited in Tatum v. Rosenthal, 95 Cal. 129, 30 Pac. 137.]

3. It is only when it appears that a distribution of such fund must be made, that a decree will be entered for the benefit of all.

[Cited in Shackelford's Adm'r v. Clark, 78 Mo. 490.]

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

4. A judgment creditor, who has exhausted his legal remedy, may pursue in a court of equity any equitable interest, trust or demand of his debtor, in whosesoever hands it may be. If a party thus reached has a remedy over against others for contribution or indemnity, it will be no defense to the primary suit against him, that they are not parties.

[Cited in Hatch v. Dana, 101 U. S. 212; Holmes v. Sherwood, 16 Fed. 729; Mann v. Appel, 31 Fed. 383.]

[Cited in Clapp v. Peterson, 104 Ill. 35; Thompson v. Reno Sav. Bank, 19 Nev. 103, 7 Pac. 72; Brundage v. Monumental G. & S. Min. Co., 12 Or. 322, 7 Pac. 317.]

5. Where a debtor, as in case of a bank, has a right to call for payment of stock subscriptions, and does not choose to exercise it, equity, at the instance of creditors, will exercise it for him.

6. When a person subscribes stock, and his subscription is accepted, it is not a mere power in the bank, but its right to call in the money, and it is the right of the stockholder to pay it; he is not obliged to wait until a call is made.

7. Unpaid subscriptions to the capital stock of a company are corporate property, constituting a trust fund which can be reached by the creditors in a court of equity.

[Cited in Lewis' Adm'r v. Glenn, 84 Va. 971, 6 S. E. 878.]

8. The amount subscribed, and not the sums actually paid in, is the capital stock of the company.

9. The equity of the right in the bank to sue is attendant on the legal right vested in the holder of the bills as such; it goes with it as an incident.

10. When a judgment creditor of a bank has exhausted his remedy at law, and seeks in equity to enforce payment of stock subscriptions, the stockholders cannot go behind the judgment rendered against the bank and question the original cause of action, unless they can show collusion between the creditor and the bank, for the purpose of defrauding them.

[Cited in Wetherbee v. Baker, 35 N. J. Eq. 507; Baines v. Babcock, 95 Cal. 583, 592, 27 Pac. 676, and 30 Pac. 776.]

11. The fact, that when the state of Georgia applied for readmission to the Union, under the constitution of 1868, congress imposed certain conditions, does not make that constitution an act of congress, or tantamount to such an act. See Hatch v. Burroughs [Case No. 6,203].

12. The question, as to whether the adoption of the constitution of the state of Georgia of 1868 was the act of the people of the state, is a political one, in which the courts must follow the action of the political department of the government.

13. A state can no more pass a law violating a contract by means of a convention, than it can by means of a legislature; and a constitution adopted by a state, with a view to its admission or readmission, or after its admission into the Union, must be regarded as a law of the state, and amenable to the prohibitory clauses of the constitution of the United States. See Gray v. Davis [Case No. 5,715].

14. The final portion of article 5, § 16, subd. 1, of the constitution of Georgia, of 1868, which throws the burden of proof on the plaintiff to show that bills sued on have never been used in aid of the Rebellion, if only the defendant swears that he has reason to believe that they were so used, is not constitutional.

15. The fact, that holders of unpaid stock may have severally redeemed their share of the bills of the bank, does not release them from liability for the amount due on their stock subscriptions.

In equity. Submitted for final decree upon the pleadings and evidence.

[This was one of a number of proceedings brought both at law and in equity by William N. Marsh and others against the stockholders of the Merchants' & Planters' Bank of Savannah to enforce the payment of claims against the bank. For a suit at law involving nearly the same questions as in this case, but brought under the Georgia statute against a stockholder fully paid up, see Case No. 6,-203.]

Wm. Daugherty and A. W. Stone, for complainants.

Wm. Law, T. E. Lloyd, and W. S. Basinger, for defendants.

BRADLEY, Circuit Justice. This bill is filed by certain billholders of the Merchants' and Planters' Bank of Savannah, who have obtained judgments against the bank for the amount of bills held by them against certain stockholders of the bank, who have not paid in full their subscriptions of stock, seeking a decree against the defendants to the amount of their unpaid subscriptions, for the payment of the said judgment. The bank was chartered by an act of the assembly of the state of Georgia, approved February 13, 1854, by which certain persons therein named, their associates and successors, were incorporated by the name of the Merchants' and Planters' Bank, to be located at Savannah, with the usual powers given to such institutions. By the second section of the charter it was declared that the capital of the bank should be two millions of dollars, to be divided into twenty thousand shares of one hundred dollars each, and that so soon as ten per cent. of said capital was subscribed and paid in in specie, or specie funds, it should be the duty of the commissioners named in the act to call a meeting and organize the bank by the election of directors. The directors were empowered to appoint a president and other officers. By the seventh section the president and directors, after the first installment on subscriptions to the amount of two hundred thousand dollars had been paid in, were empowered to call in further installments of not over twenty per cent. at any one time, by giving at least sixty days' notice of said call. On failure to pay up a call the shares might be forfeited. By the 9th section, it was declared that the total amount of the debts should not, at any time, exceed three times the amount of the capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe keeping. By the 15th section, it was declared that the persons and property of the stockholders should at all times be liable, pledged and bound for the redemption of bills and notes at any time issued, in proportion to the number of shares that each individual and corporation might hold and possess.

The bill alleges that the capital stock of the bank was all duly subscribed and the bank duly organized shortly after its incorporation, and that it went into operation, issued bills, received deposits and carried on a general banking business; that the complainants severally became lawful owners and holders of the bills of the bank, to wit: Scott, Zerega & Co., to the amount of $62,500, which were presented to the president and cashier in March, 1867, and were not paid, and the other complainants other amounts, which were presented at or about the same time with like result; that thereupon the complainants separately instituted actions at law on their bills against the bank, and on the 25th of November, 1867, recovered judgments as follows: Scott, Zerega & Co., for $71,789.35; Frisbee & Roberts, for $33,134.75; Wm. N. Marsh, for $57,600.63; George W. Hatch, for $81,271.20; Levi H. B. Scott, for $120,789.36; and that executions were issued in all the judgments and returned "nulla bona" on the 23d of May, 1868. The bill alleges that the bank had become insolvent, and had assigned its assets to Hiram Roberts, the president, in trust for the benefit of its creditors; but that the assets assigned would not pay more than ten cents on the dollar of its indebtedness, which amounted to a million of dollars or thereabouts. As an excuse for not joining other complainants, the bill alleges that the circulation of the bank was held in every state of the Union by innumerable unknown persons; and as an excuse for not making all the stockholders defendants, it alleges that there are 20,000 shares of stock held by a great number of stockholders residing in different states—some insolvent, some dead, etc. The bill then alleges that the defendants are stockholders, and states the number of shares held by each, and the amount paid thereon, and the amount still unpaid, and claims that the unpaid stock is a trust fund applicable to the payment of the debts of the bank, inasmuch as the debts cannot be paid by the assets. The bill prays that this may be so decreed, and that the defendants may be required to pay to the complainants, or into court, or in some other manner, the several amounts so in their hands respectively, and that the same may be applied to the payment and satisfaction of the bills held by the complainants.

By an amended bill, they allege that they purchased the bills prior to January 1, 1867, in a fair course of trade, for a valuable consideration, and without any notice that they had been used in aid of the rebellion or for any other illegal purpose. The principal facts stated in the bill are not disputed. The defendants, by their answers and in argument, set up various grounds of defense, which I will proceed to examine.

1. It is objected that the bill is defective for want of parties, both complainant and defendant; that it should have been filed by, or in behalf of, all the creditors, because all are interested in the funds—and against all the stockholders, because all are bound to con-

tribute pro rata. As to the complainants, it has long been settled that a judgment creditor who has exhausted his legal remedy, by execution returned "nulla bona," may alone, or with other judgment creditors, file a bill against persons holding property of the debtor which, on account of fraud or the existence of a trust, cannot be reached by execution. 2 Kent, Comm. 443, and notes; McDermutt v. Strong, 4 Johns. Ch. 687; [Hadden v. Spader, 20 Johns. 554;] 2 Spader v. Davis, 5 Johns. Ch. 280; Lentilhon v. Moffat, 1 Edw. Ch. 451; Dix v. Briggs, 9 Paige, 595; Storm v. Waddell. 2 Sandf. Ch. 494; [Tappan v. Evans, 11 N. H. 311;] 2 Ogilvie v. Knox Ins. Co., 22 How. [63 U. S.] 380; Dunphy v. Kleinschmidt, 11 Wall. [78 U. S.] 610. Where a case exists in which a fund can only be divided satisfactorily among a certain class of persons, it is necessary to frame the decree in such a manner as that all those persons may be brought in for their distributive shares; but even then, the bill may often be filed by any one of them on his own behalf. It is only when it appears to the court by the subsequent pleadings, or otherwise, that a distribution must be made (as where an executor pleads want of sufficient assets), that a decree will be made for the benefit of all. In this case. what law compels an equal distribution of the fund sought to be reached amongst all the creditors? The assets in the hands of the assignee are subjected to such a law, because they have been granted to him in trust for all creditors equally. But it is conceded that the unpaid capital stock is not subject to the assignment. If subjected to the demands of the complainants as judgment creditors, it will be exonerated, pro tanto, from all further demands. As to the nonjoinder of necessary defendants, the same authorities above quoted may be cited. A judgment creditor, who has exhausted his legal remedy, may pursue, in a court of equity, any equitable interest, trust or demand of his debtor, in whosesoever hands it may be. And if the party thus reached has a remedy over against other parties for contribution or indemnity, it will be no defense to the primary suit against him that they are not parties. If a creditor were to be stayed until all such parties could be made to contribute their proportionate shares of the liability, he might never get his money.

2. It is contended that the unpaid subscriptions of capital stock are not assets for the payment of debts, either legal or equitable; that they exist merely as possibilities; that they are not a debt due, having never been called in; that no one can call them in but the directors; and in them it is a mere discretionary power, which cannot be exercised, either by the assignee, the receiver, or the court itself, and cannot be assigned; that said unpaid subscriptions are no part of the capital stock of the bank; and that the real

2 [From 10 Am. Law Reg. (N. S.) 718.]

capital stock is what has been called in, namely $535,000, and not $2,000,000. This position may be somewhat plausible, but it is not sound. It is not a mere power vested in the bank to make further calls. It is a right; and where a debtor has such a right and does not choose to exercise it, equity, at the instance of creditors, will exercise it for him. When a stockholder subscribes stock, and his subscription is accepted, it is not only the right of the bank to call in the money, but it is the right of the stockholder to pay it. The mode of calling it in, prescribed by the charter, is a mere form of remedy given to the bank to enforce the subscription, usually followed by forfeiture for nonpayment, if the bank so choose. But the stockholder is not obliged to wait until a call is made upon him. He may pay in at any time; and if the business of the bank were very profitable, no doubt he would avail himself of the opportunity. Such a right cannot be described as a mere power on the part of the bank, to be exercised or not, as it chooses, and dependent for its existence on the personal discretion of the directors. The same objections were made in the case of the Planters' and Mechanics' Bank of Columbus, and were overruled by the supreme court of this state in Hightower v. Thornton, 8 Ga. 486. and it was there held that unpaid subscriptions to the capital stock of a company are corporate property, constituting a trust fund, which can be reached by the creditors in a court of equity; and that the amount subscribed, and not the sums actually paid in, is the capital stock of a company. As to the position that the equity of the creditor is a mere right to sue, and is not therefore assignable, and could not be assigned to complainants, it is sufficient to say that the equity is attendant upon the legal right vested in the holder of the bills as such. It goes with that as an incident, and does not belong to that class of mere rights of action which become separated from the thing out of which they grew, and attach to the person only—as the right to sue for a trespass committed and the like.

3. The next point made is, that if the unpaid subscriptions are indeed assets for the payment of debts, then they have been assigned, and are in the receiver's hands, and must be collected and administered by him for the equal benefit of all the creditors under the trust of the assignment. But an examination of the assignment will show that it does not assume to convey these subscriptions; but on the contrary specifically assigns those things which are set out in a schedule annexed to the assignment, and does not contain any general words sufficiently comprehensive to cover stock subscriptions. And as the assignment is a common law instrument, deriving no extraneous efficacy from the statute law of Georgia, except the general statute which gives assignability to bonds, specialties and other contracts in writing for the payment of money, or any

article · of property, judgments and executions (Code, § 2725), it cannot be construed to reach the claims in question. Besides, the attitude of the bank, its directors and stockholders, from the first, has been inconsistent with the idea that these unpaid subscriptions were embraced in the assignment. It is just what they always have opposed and denied.

4. Another point quite strenuously urged by the defendants is, that the bills held by the complainants were issued directly to the Confederate States government, and to the state of Georgia during the Rebellion, and in aid thereof. The answers severally allege this fact, and the only evidence offered by complainants to rebut it is proof that they purchased the bills in open market, in regular course for value paid, without any notice or suspicion that they were issued for any illegal purpose. The defendants, therefore, rely on the article 5, § 16, subd. 1, of the constitution of 1868, which not only nullifies all contracts made during the rebellion, in aid thereof, but all bonds, deeds, promissory notes, bills or other evidences of debt, made in connection with such contracts, or as the consideration therefor, or in furtherance thereof; and declares that when the defendant will make a plea, supported by his affidavit, that he has good reason to believe that the obligation or evidence of the indebtedness on which the suit is predicated, or some part thereof, has been given or used for the illegal purpose aforesaid, the burden of proof shall be upon the plaintiff to satisfy the court and jury that it is not founded upon, or in any way connected with, any such illegal contract, and has not been used in aid of the Rebellion; and the date of the bill, etc., shall not be evidence that it has or has not, since its date, been issued, transferred or used in aid of the Rebellion.

Now, in reference to this point, it is to be observed that it does not fairly arise in the case. The bill of complaint is founded on certain judgments and executions in favor of the complainants, which were recovered in 1867. Had any such defense, as is indicated by the answers existed, it should have been made to the actions at law; for, although the constitution did not then exist, yet it would have been a good defense to have shown that the bills were issued in aid of the Rebellion, and that the plaintiffs knew it, or had reason to know it. Not being set up then, it cannot be set up now. The stockholders of the bank cannot ask to go behind the judgments rendered against the bank, and question the original cause of action, unless they can show collusion between the plaintiffs and the bank, entered into for the purpose of defrauding the stockholders. But even if the question were open I could not yield to the force of the defendants' argument. They contend that the constitution of 1868 has all the force and effect of an act of congress, and, therefore, is not obnoxious to that clause of the constitution of the United States which de-

clares that no state shall pass any law impairing the obligation of a contract; that the constitution of 1868 has the force and effect of an act of congress, they insist, because it was adopted under the reconstruction acts, under military supervision, and not by the free consent and express will of the people of Georgia, and because, after its adoption by the convention, it was revised by congress and certain parts were struck out—or, at least, congress made it a condition of admission that they should be struck out—and that the legislature should ratify the fourteenth amendment to the constitution of the United States (see Act June 25, 1868; 15 Stat. 73); and that this was, in effect, an approval and adoption by congress of the parts not excepted to.

I cannot concur in this view. What was the precise status of Georgia after the war, and before its readmission into the Union, with all the normal relations of a state, will, perhaps, never be defined to the satisfaction of all. But that some sort of rehabilitation was necessary in order that Georgia might occupy her old position in the Union—that the adoption of a new constitution was one of the necessary things to be done, and that an act of the national authority, admitting Georgia to the representation and status of a state in harmonious relations with the Union, was also a necessary thing to be done—seem to be propositions that can hardly admit of a doubt. This conceded, how can it be said that the adoption of the constitution of 1868 was not · the act of the people of Georgia? The courts cannot do otherwise than regard it as such. This is a political question in which the courts must, follow the action of the political department of the government. To adopt any other course would be to introduce the greatest confusion. Congress, as was its right, regulated the elective franchise. There was no other legal authority to do it. The executive had no such authority. The state government of Georgia was a mere provisional one, and could not legally do it. No interference with the freedom of elections was interposed; on the contrary, the general government took measures to prevent any such interference. All that congress had to do, in relation to the constitution, when the state applied for readmission, was to impose certain conditions, to wit: That certain unwise clauses should be left out of the constitution, and that the legislature should· ratify the fourteenth amendment. This was done. But Georgia was not compelled to do it. She could do as she pleased. It was at her own option. How can this possibly make the constitution an act of congress, or tantamount to such an act?

Then, is a provision in a state constitution which impairs the obligation of a contract void? I have no doubt on the subject. A state can no more pass a law violating a contract, by means of a convention than it can by means of a legislature; and a consti-

tution adopted by a state, either after its admission, or with a view to its admission or readmission into the Union, must be regarded as a law of the state, and amenable to the prohibitory clauses of the constitution of the United States. Then, looking at the constitution of 1868, does the clause relied on impair the obligation of a contract? The first part of the clause, which declares void all contracts made in aid of the Rebellion, only expresses what would be the law without any declaration on the subject. The second part, which avoids the instruments in whosesoever hands they may come, when applied to such instruments as bank bills, is more questionable. But the final portion, which throws the burden of proof on the plaintiff to show that the bills have never been used in aid of the Rebellion, if only the defendant will swear that he has reason to believe that they were so used, imposes upon the plaintiff an impossibility, and is tantamount to destroying the contract on the simple oath of the defendant as to his belief. I cannot think that such a provision is constitutional.

5. But the defendants make still another point, namely: that they have severally redeemed their shares of the bills of the bank, and have them ready to show as offsets to their liability as stockholders. This part of the answer relates only to the personal liability of all stockholders for the debts of the bank, under the fifteenth section of the charter, and not to their liability for unpaid subscriptions to stock. But, supposing the answer was right in form, could the defendants set up this defense to the bill? They do not show how they procured the bills. They have not recovered judgment on them. They may be unable to do so. The bills they hold may be open to the very objections they raise against the bills held by the complainants. They would not be permitted to pay up their subscriptions, if called on by the bank, in its old, depreciated currency. The most they can do with these bills, it seems to me, is to present them to the receiver for their pro rata share of the assets of the bank: or, if they can recover judgment on them, to pursue the course which has been pursued by the complainants, if it is competent for them to sue other stockholders when they themselves are owing the bank.

For these reasons, I think a decree must be made in favor of the complainants, the form of which, on reflection, I think should be that the *defendants should severally pay* to the complainants the amounts due by them for unpaid stock, so far as may be necessary to satisfy the amount of the complainants' judgments, interest and costs. It was suggested that those who had paid the least per centage on their stock should be first called upon, but I think all are equally liable to pay what they have not paid on their subscriptions; and, although the directors might be required to pursue that order, I do not think the court is bound to follow the directions marked out for the directors. It was also suggested that the decree should be based on a settlement and distribution of the fund in the hands of the receiver, and should make the defendants liable only for such balance as might be due to the complainants after receiving their share of that fund; but this would postpone the complainants indefinitely, and it seems to be generally conceded that the assets in the receiver's hands are not sufficient to pay the other creditors.

Decree for the complainants.

[NOTE. At a later date the court heard two of these cases together,—a case at law and one in equity. They were heard upon demurrer to plea in bar in both cases. The plea to the bill was sustained, but the plea to the declaration was held not sufficient. Case No. 9,111. In the law case the defendants sued out a writ of error in the supreme court, when the judgment of the circuit court was reversed, and a new trial nisi ordered. Mills v. Scott, 99 U. S. 25.]