*1838.*

NATHAN
*v.*
WHITLOCK.

NATHAN, Receiver of the Mohawk Insurance Company of New-York, v. WHITLOCK. (*a*)

On the formation of the M. Insurance Company, the directors resolved to reserve a majority of the stock for themselves. Each director subscribed for 1042 shares, and gave a promissory note for the amount. The defendant W. was one of these directors, giving his note in $20,840 for 1042 shares. The company became embarrassed; and W. induced the president, B., in consideration of $6,000, to stand in his place for the shares. This was done without any sanction of the company. B. gave up (from the company's effects) to W. his note for the $20,840, and substituted his own and had the 1042 shares of stock placed in his, B's., name. B. was, at this time, insolvent: *Held*, to be a fraud on the creditors of the company, and that W. should make good the amount of his note for $20,840.

On the third of April, one thousand eight hundred and twenty-four, the Mohawk Insurance Company was incorporated. Its capital was to be five hundred thousand dollars, divided in shares of twenty dollars each. By its act of incorporation, all the capital was to be subscribed for and paid in

*May 23, 24.*
*1838.*

*Corporation.*
*Fraud.*
*Director.*
*Stockholder.*

(*a*) Affirmed by the chancellor.

before the company could proceed. It was to act through directors, (fourteen) and a majority was to make a quorum. Among the persons named in the act as first directors were the defendant, Whitlock, and also John D. Brown.

When the directors first met, they passed a resolution to reserve a majority of the stock for themselves, while the books of subscription for the residue were to be opened under the direction of a committee of the board.

In order to keep a control, the directors resolved, as to the shares taken by themselves, that the amount of them should be considered as loaned at seven per cent. interest, or, in case a director paid ten per cent. towards his stock, the residue of the par value was to be loaned to him at six per cent. interest; and no director was to sell other than to a co-director, and he should be allowed the actual value to be ascertained from the books.

Afterwards, the directors fixed the interest on the directors' stock notes at six per cent.

Thirteen directors (one having resigned) subscribed each for one thousand and forty-two shares.

The directors gave notice that the company would go into operation on the first day of May, one thousand eight hundred and twenty-four, and that any stock not subscribed for would be assumed by the directors.

The defendant, Whitlock, gave to the Mohawk Insurance Company his promissory note for the sum of twenty thousand eight hundred and forty dollars, payable on demand, and bearing interest at six per cent.; and he hypothecated his one thousand and forty-two shares of stock to the company to secure the payment of the note.

During the month of June, one thousand eight hundred and twenty-five, the Mohawk Insurance Company had insured a ship for J. Webb & Co. to the amount of nineteen thousand dollars. She became a total loss; and the company being sued, a judgment was obtained against them for upwards of twenty-three thousand dollars, including interest and costs. By this and other losses, the company became impaired in its capital.

John D. Brown was, at this time, the president of the com-

pany; and in the month of April one thousand eight hundred and twenty-six, the defendant Whitlock (and he was still a director) agreed with Brown to sell him his stock and get up his stock note; and Whitlock was to give him good paper to the amount of six thousand dollars.   This agreement was perfected on the fourteenth day of the same April, but it did not take place with any concurrence of the board of directors.   Brown had his note substituted for a similar amount (twenty thousand eight hundred and forty dollars) and hypothecated the stock which had been Whitlock's for its payment.   And by way of consideration for this arrangement, Whitlock gave him two promissory notes, one for fifteen hundred dollars and the other for four thousand five hundred dollars.

The note of Brown, which had been substituted, was never paid, but Whitlock's promissory note for four thousand five hundred dollars fell into the hands of some of the directors; and, when it became due, it was paid.

The present complainant became the receiver of the Mohawk Insurance Company; and he filed the bill in this suit to obtain satisfaction, from the said Whitlock, of his stock note which had been given up to him by Brown under the arrangement aforesaid.

Mr. *Cutting*, for the complainant.

Mr. *Anthon*, for the defendant.

1838.

NATHAN
*v.*
WHITLOCK.

THE VICE-CHANCELLOR :—After carefully considering this case in all its bearings and upon all the points that have been made, I cannot bring my mind to any other conclusion than that the defendant is liable and bound to make good the stock which he subscribed for in the company on its organization and for which he gave his note in the sum of twenty thousand eight hundred and forty dollars.   Those who dealt with the company and became its creditors had a right to rely upon the good faith of the directors, of whom the defendant was one, that the requisition of the third section of their charter was complied with, that the whole capital of five hundred thousand dollars was subscribed and actually paid before the company commenced business.   The directors, indeed, advertised and an-

*March* 12
1839.

VOL. III.—28

nounced it as a fact, and, upon that ground, solicited business
and invited public confidence. Whatever coloring may be
given to the manner of subscribing and paying for the stock, it
is very manifest that the directors did not pay for the stock
and then take back the money by way of loan from the com-
pany; but gave their notes in payment of the stock and called
them stock notes and then pledged the shares by way of se-
curity to the company for the notes. This mode of forming
a capital stock, upon the mere personal responsibility of in-
dividuals, without any other security or basis, was found to be
so fallacious and deceptive that in the year one thousand eight
hundred and twenty-five it was expressly forbidden by legisla-
tive enactment, (see act of April 21, 1825.) Indeed, the pro-
priety of such a law is strongly exemplified in the consequen-
ces which resulted to this company in about two years after its
commencement, from not having had its capital paid in. If the
subscribers to the stock are permitted to go without paying or
securing the payment of their stock notes by something more
than an hypothecation of the stock itself, it amounts not only
to a breach of trust on the part of the directors, but to a fraud
upon the community, in holding up an empty, hollow concern,
instead of a solid and durable one.

This company, during its existence, had very little more
than an exterior—within, it was almost vacuity. The di-
rectors (fourteen in number) had resolved to take a majority
of the stock and they accordingly took to the amount of two
hundred and eighty thousand dollars or thereabouts, giving
their notes for twenty thousand eight hundred and forty dollars
each on interest; and they resolved further that if any direc-
tor determined to withdraw or sell his stock, he should sell it
to the remaining directors in preference to any others. Their
motive in this was quite obvious. It was to keep the control
of the company in their own hands—to prevent the power over
the notes they had given and over the stock they held from
departing from them. In the progress of their business during
the first two years (1824 and 1825) the company were unfor-
tunate. Heavy losses occurred upon their policies, so as to
cause a depreciation of the stock below par value even if it had
all been paid for. Most of the original directors, who had as-
sumed so large a portion of the stock, were unable to pay their

notes, with but a solitary exception : and the defendant in this cause formed that exception. They had, by the month of April one thousand eight hundred and twenty-six, become insolvent or were on the verge of insolvency. Certain it is that, during the summer of that ill-fated year to many incorporated institutions as well as individuals, the directors alluded to, with but the one exception, became openly and confessedly insolvent and their stock notes of little or no value. In proportion to the worthlessness of the notes, was the diminution in value of the shares held by stockholders ; and the prospects of the company, under these circumstances, could not be otherwise than discouraging. It was, then, natural enough for the defendant to resort to some expedient for extricating himself from the danger in which he was placed of being obliged to pay off his note and losing his money in the sinking condition of the company. For this purpose he negotiated with John D. Brown, the president of the company, for a sale of his shares to him. The transaction, however, may more properly be characterized as a hiring of Brown to take his, the defendant's, place in relation to the stock, to assume his liability to the company, by substituting Brown's note for twenty thousand eight hundred and forty dollars in the place of the defendant's original stock note of the like amount for the consideration of six thousand dollars to be paid by the defendant to Brown for so doing. A bargain to this effect was consummated between them, on the fourteenth day of April one thousand eight hundred and twenty-six, by the defendant's executing a transfer in the transfer book at the office of the company in the usual form, of his whole one thousand and forty-two shares of stock and giving to Brown his two promissory notes amounting to six thousand dollars— one for fifteen hundred dollars and the other for four thousand five hundred dollars, and thereupon Brown executed to the company his individual promissory note for the nominal par value of the shares, viz., twenty thousand eight hundred and forty dollars and hypothecated his shares to the company as security for his note, by executing the usual printed form of an instrument of hypothecation prepared in a book kept in the office of the company and procured and delivered up to the defendant his original stock note.

At this time, Brown was insolvent. It is in vain to attempt

to disguise the fact ; he confesses it himself.  He had taken the benefit of the insolvent act in eighteen hundred and twenty-three.  Judgments to a large amount existed against him.  The proofs show that he was unworthy of credit  He already owed the company, on his own original stock note, twenty thousand dollars and upwards ; and only a small part of this and not a dollar of the new or substituted note, except four thousand five hundred dollars which I shall  presently notice, was ever paid by him.  The notes were afterwards, on the twenty-eighth day of September one thousand eight hundred and twenty-eight, given up to him and cancelled, on his securing to them eight hundred dollars by way of compromise and on his executing to the company an absolute transfer of all the stock, being two thousand four hundred and twelve shares, which then stood in his name.

As between the defendant and the company itself, his trans-action with Brown might be permitted to stand, so long as the rights of creditors or third persons were not prejudiced by it. But the question is, can it stand when the rights of creditors intervene and are prejudiced ?  It is argued that the directors of the company and the finance committee knew of and ap-proved and sanctioned the arrangement and the giving up of the defendant's note on receiving that of Brown.  But the tes-timony falls short of establishing the fact of a sanction by them in their official or corporate capacity.  Some of the directors and members of the finance committee knew of the arrange-ment at the time, but others did not ; and it is in evidence that the board of directors never met and passed upon the subject, nor does it appear that the finance committee ever acted upon it as such committee so as to render any sanction and approval, which individual members may have expressed, an official and binding act of the corporate body.  But if the directors or any committee of the directors charged with the subject had  met and officially authorized the giving up of the defendant's note in itself valuable, and a sufficient security for the note of Brown, having comparatively no value or responsibility attached to it, I am not prepared to say that it would  not have been such a dereliction of duty on their part, such a want of good faith towards the creditors or persons having claims upon the capital and assets of the corporation, over which they were  the trus-

tees and managers, as would subject them to a personal liability to make good the loss to those injured by the act. This, however, is not the question at present, with regard to the directors generally. But it is virtually the question as respects the defendant, who was himself a director and knew the condition of the company; was acquainted with its affairs; with Brown's circumstances; and the circumstances of other directors who owed for large amounts of stock and knew also that claims existed for losses which had occurred in the year one thousand eight hundred and twenty-five. He was bound, therefore, to do no act which should defeat or impair the security upon which such claimants or creditors had a right to repose.

There is another feature of this case, which appears to me to be hardly reconcilable with fairness in the transaction towards those having claims upon the company. It is that part of the agreement by which the defendant was to pay to Brown the six thousand dollars for stepping into his shoes and assuming his liability for the stock. As the defendant was willing to lose six thousand dollars on the stock he had subscribed for, why did he not offer to pay that money directly to the company, on account, and then, if the company were willing to take Brown as paymaster for the balance, why not substitute Brown's note for the balance only, upon the defendant's transferring to him the whole of the stock? If Brown intended to act honestly towards the company by ultimately paying for the stock, this course would have been the same to him. It appears, however, that when the defendant's note of four thousand five hundred dollars, given to Brown, came to maturity, he consented to give it up to the company, and it was accordingly paid to them and the amount was credited on the substituted stock note as part payment thereof. While, therefore, I hold the defendant to be equally liable now as he ever was to make good this portion of the capital stock of the company for which he subscribed and gave his note of twenty thousand eight hundred and forty dollars, I think he is clearly entitled to have credit for the four thousand five hundred dollars, which found its way into the company as a payment on account. The other sum of one thousand five hundred dollars, to make up the six thousand dollars, was paid to Brown and does not appear to have been paid over to the com-

pany ; and he is, therefore, not entitled, as against the company, to a credit for the amount.

It has been urged in argument that the receiver who files this bill represents the corporation and stands in the place of the corporate body with respect to this suit and that the decree now to be made can be made upon no other principle than if the corporation of the Mohawk Insurance company was itself the complainant. I apprehend this is too limited a view to be taken of the case. The receiver was appointed at the instance of judgment creditors under the statute ; and the court is bound to look beyond his mere appointment and to the rights of those standing behind him and to do justice to them, such being the object of this suit.

Decree : that the master compute the balance due from the defendant for principal and interest for the one thousand and forty-two shares which he held in the company, &c., and, upon confirmation of the report, that the complainant have execution for the same and for the costs of this suit to be taxed.