CLEOPATRA, The (UNITED STATES v.). See Case No. 2,886.

CLERK'S FEES, Case of. See Case No. 472.

CLERK'S FEES IN BANKRUPTCY CASES. See Append. Fed. Cas.

CLEVELAND, The (HUNT v.). See Case No. 6,885.

CLEVELAND (BHOLEN v.). See Case No. 1,381.

CLEVELAND (DRAKE v.). See Case No. 4,059.

## Case No. 2,887.

CLEVELAND v. LA CROSSE & M. R. CO. et al.

[7 Am. Law Reg. 536; 4 Quart. Law J. 230.]

District Court, D. Wisconsin. 1859.

VALIDITY OF CONVEYANCES BY CORPORATION— RIGHTS OF CREDITORS.

1. A deed of land by the corporation to two of its directors is void as against creditors of the corporation.

2. A lease of a railroad and rolling stock, with the power in the lessee to run the road and to purchase additional rolling stock at his discretion, and to extend the road out of the proceeds of revenue, the lease being for an indefinite term of time, is void as against creditors of an insolvent company, for hindering or delaying them in the collection of their debts.

[In equity. Bill by Newcomb Cleveland against the La Crosse & Milwaukee Railroad Company, Selah Chamberlain, Moses Kneeland, and others, to subject certain real estate conveyed by the corporation to judgment and execution, and for a conveyance by the defendants Kneeland and Ludington to the purchaser on the executor's sale.]

MILLER, District Judge. The complainant recovered a judgment in this court for $112,271 against this company, on the 7th October, 1857. On the 22d of the same month he issued a writ of fi. fa. on the judgment; under which was levied the railroad of the company, and all the franchises, rights and privileges thereunto belonging and appertaining, including roads, roadways, rights of way, and real estate of every description, station houses, buildings, and the grounds and lots, cars, locomotive engines, etc. And also the Milwaukee and Watertown Division. And also several lots in the city of Milwaukee, describing them. The company, having the lots for sale, accepted a proposition of purchase from C. D. Nash, a person not connected with the company; and for the consideration of twenty-five thousand dollars, part in farm mortgage bonds and part in stock of the company, the lots were conveyed to him. This sale was brought about, and the consideration was furnished by Moses Kneeland, a member of the board of directors; who afterwards received the

title from Nash, and conveyed an undivided interest to James Ludington, another member of the board. There was a large amount of testimony respecting the value of the lots; some witnesses valuing them about the amount of the consideration of the conveyance, some less than that amount, and some very much higher. There was proof of large expenditures by Kneeland and Ludington in dredging the river, building docks, and in other permanent improvements. At the time of this sale the complainant was a creditor of the company, as a contractor for building a portion of the road. The bill prays a decree that the lots be subject to the judgment and execution, and to a sale in satisfaction of the judgment, and that Kneeland and Ludington shall convey them to the purchaser under the execution.

Directors of an incorporated company are trustees of the corporators; and have possession of the corporate property for the corporators, and the creditors of the company. All property of a corporation not sold in good faith, is liable to its creditors for the payment of its debts. 2 Story, Eq. Jur. § 1252; Curren v. State Bank of Arkansas, 15 How. [56 U. S.] 304; Mumma v. Potomac Co., 8 Pet. [33 U. S.] 281–286. It is well settled that trustees cannot purchase the trust estate. They are the vendors dealing for the interest of the corporation in making sale; the representatives of the company. Such persons cannot be permitted to purchase, where they have a duty to perform inconsistent with the character of purchasers. Deeds made between persons who are not standing in the relation of vendors and purchasers, whether directly or indirectly, are voidable, even upon a fair consideration paid. Michaud v. Girod, 4 How. [45 U. S.] 503; Hawley v. Cramer, 4 Cow. 717; Torrey v. Bank of Orleans, 9 Paige, 649; 7 Hill, 260; Grant, Corp. 159, and notes. And the use of a go-between is an evidence of fraud. Such deeds convey a title good against all persons but the cestui que trust, and as to him they are void; but he may confirm them by receipt of the purchase money, or by release, with full knowledge of the facts. The company made no objection to the sale after it became known that the purchase was made for Kneeland and Ludington; but by a resolution, the board confirmed those deeds, since this bill was filed. The question is, whether this plaintiff, as a creditor of the company, can by this bill and proceeding, obtain a decree affecting these deeds. If those deeds had not been made, it is clear that the lots would be subject to levy and sale as the property of the company, under the plaintiff's execution. And if the lots are now in equity the property of the company, they are subject to sale in satisfaction of the judgment, according to the law of the state. The company might have obtained a decree vacating those deeds, and then have turned out the lots, discharged of

the apparent clouds upon the title, for sale under this execution. This the company should have done, after it became known that two of the directors were the purchasers.

A creditor of an insolvent corporation cannot sustain a suit at law against the directors thereof for negligence in the management of its affairs, whereby its property has been wasted, and its means of paying the plaintiff destroyed. Clark v. Lawrence [Case No. 2,827]. But a stockholder in a corporation has a remedy in chancery against the directors to prevent a misapplication of their capital or profits, which might lessen the value of the shares if the act intended to be done amount to a breach of trust or duty. Dodge v. Woolsy, 18 How. [59 U. S.] 331. Then why should not this judgment creditor sustain this bill against the company and directors of the company, to have applied to his debt property which was conveyed by the company to those directors by either voidable or fraudulent deeds, after the company has refused to discharge its duty as an honest debtor? It is a grave question whether these deeds should not, under the circumstances, be considered voluntary conveyances in fraud of creditors. It is said, in the opinion in the case of Curren v. State of Arkansas. 15 How. [56 U. S.] on page 307: "The plaintiff is a creditor of an insolvent banking corporation. The assets of such a corporation are a fund for the payment of its debts. If they have been distributed among stockholders, or gone into the hands of others than bona fide creditors or purchasers, leaving debts of the corporation unpaid, such holders take the property charged with the trust in favor of creditors, which a court of equity will enforce and compel the application of the property to the satisfaction of their debts." In that case the state of Arkansas, as a stockholder, by acts of the legislature, invested itself with assets of the corporation. See 2 Story, Eq. Jur. § 1252; Mumma v. Potomac Co., 8 Pet. [33 U. S.] 281; Wood v. Dummer [Case No. 17,944]; Wright v. Petrie, 1 Smedes & M. Ch. 319; Nevitt v. Bank of Port Gibson, 6 Smedes & M. 513; Hightower v. Thornton, 8 Ga. 493; Nathan v. Whitlock, 3 Edw. Ch. 215, 9 Paige, 152; Vose v. Grant, 15 Mass. 505; Spear v. Grant, 16 Mass. 9; Curson v. African Co., 1 Vern. 121. But if there should be any doubt of the right of the plaintiff to bring this bill, the law of the state entirely removes it. The statute provides, that the circuit courts of the state shall have jurisdiction over directors, managers, trustees, and other officers of corporations, to compel them to account for their official conduct in the management and disposition of the funds and property committed to their charge; to order and compel payment by them to the corporation whom they represent, and to its creditors, of all sums of money, and of the value of all property which they may have acquired to themselves; to set aside all aliena-

tions of property made by trustees or other officers of the corporation, contrary to the provisions of law, in cases where the persons receiving such alienations knew the purposes for which the same were made. And the jurisdiction thus conferred may be exercised as in ordinary cases on complaint or petition of a creditor of the corporation. The statute is sufficiently comprehensive to cover the case made by this bill. It is contended on behalf of the defendants, that that law cannot be enforced by this court; but in this I think the counsel are mistaken. The statute laws of the state do not confer jurisdiction on the federal courts, but those courts extend to their suitors the remedies provided by those laws of the states wherein they are located, according to their own rules of practice. Ex parte Biddle [Case No. 1,391].

It is contended on behalf of the defendants, that if the lots should be adjudged bound by plaintiff's judgment and execution; the consideration of the purchase, and their disbursements for taxes and improvements should be recognized as a paramount lien in equity. With the consideration paid this plaintiff has nothing to do. He is not such a cestui que trust as an heir, legatee or ward who has received a part of the consideration to be accounted for, as in the case of Michaud v. Girod, 4 How. [45 U. S.] 503. What they or the company did with the consideration is not a matter for inquiry. The consideration was of rather an unusual nature, to pass between a corporation and its directors. The company and these directors will have to settle the matter between themselves. If the consideration had been paid in cash, and proven to have been appropriated to the payment of legitimate debts of the company, it might possibly be considered a paramount lien; but I do not consider that these defendants have any such claim. It is the duty of the court to place these parties, as nearly as may be, in such position that, by doing justice to one, injustice may not be done the other. For this reason the court will order a reference to a master, to ascertain the annual rents and income of the property, with interest; and also to ascertain the amounts paid by these defendants for taxes, and for the extinguishment of liens and the actual cost of permanent improvements made by them, with interest. The master may take additional testimony to that on file, and he may examine these defendants on oath touching the matter submitted to him. Upon the confirmation of the report, a decree will be made, so that the proceeds of the sale of the lots may be equitably appropriated to these parties.

This is technically a bill in aid of an execution levied; but under the prayer for general relief, the court may decree the deeds to be void, and may appoint a receiver to make sale of the property. The lien of the judgment was sufficient for this purpose,

without the service of an execution. 1 Paige, 305; 4 Johns. Ch. 677; Clarkson v. De Peyster, 3 Paige, 320; Chautauqua Co. Bank v. White, 2 Seld. [6 N. Y.] 236. The company and Chamberlain made a contract on the 20th Nov., 1856, for ballasting a portion of the road from Beaver Dam to Portage City, at forty cents per yard, the company to find the motive power. On the 20th January, 1857, they made another contract for the construction of the roadbed on the western division, extending from Portage City to La Crosse, about one hundred and ten miles of main line and side track, at $12,000 per mile; extra work specified to be paid in addition and ten per cent. to be retained from estimates; to be paid on the completion of each thirty-four miles. It was also agreed that at any time during the progress of the work, the company shall have the right to suspend the performance of the work, as it may deem expedient, and again to require it to be resumed, without being held liable for damages for such suspension; provided, that at least thirty days' notice of such suspension to be given, and a reasonable extension of time for the completion of the whole work, be allowed. And on the same day the parties made a further agreement, whereby the company extended the time for completing the work contracted for, and released Chamberlain of any claim of damages for not completing the work at the times specified. On the 30th of April, 1857, the company and Chamberlain entered into a contract for tunneling the dividing ridge, instead of a through cut, at prices largely exceeding the price specified in the original contract. On the 20th of September, 1857, the company and Chamberlain made two agreements in writing, under seal. In one, the parties agree that the contract for the construction of the western division, from Portage City to La Crosse, of January 20th, 1857, and the supplemental contract of April 30th, 1857, be so modified, that Chamberlain shall proceed to complete the construction of the road as far as the depot at New Lisbon, with reasonable dispatch, and by the first of December following. The time for completing the road from New Lisbon to La Crosse is extended indefinitely, and the road to be constructed between these last points as fast, and no faster, than the company shall be prepared and ready to pay in cash, on monthly estimates. The contract of November 20th, 1856, is also modified. And "in consideration of the extension of the time of constructing the road from New Lisbon to La Crosse; and the damages which Chamberlain will sustain by reason of such extension; and by loss on teams, materials, tools, machinery, and in other ways; and also in consideration of the mode of payment of the amount now due and the amount to become due to him for finishing the road to New Lisbon; and in consideration of the failures and delays of the company in making payment theretofore

due; and in the further consideration of the services, risks, and personal expenses of Chamberlain in the operation and management of the road, according to a contract and lease; the company agrees to pay him two hundred thousand dollars!" It is further agreed: "That before the 20th October following, a full and correct statement shall be made of the amount due to Chamberlain on the date of the agreement under the previous contract, which, together with the said sum of $200,000, shall be the balance due him on the 1st day of October, 1857, from the company. And on the first day of every month thereafter, Chamberlain shall charge the company with the amount that shall be due under or by virtue of the said contracts, or this contract, for constructing the road between Portage City and New Lisbon; and he shall credit the company with such sums as he shall receive from the net earnings of the road, by virtue of the contract of lease of this date. And on the first days of July and January in each year thereafter, a semi-annual statement of the accounts between the parties shall be made out, in which interest shall be added to the day of making such statement, at the rate of twelve per cent. per annum. Whatever sums of money shall hereafter become due Chamberlain for work in the construction of the road between New Lisbon and La Crosse, shall be paid by the company from means derived from other sources than the income of the railroad." By the other contract of the same date, the company "in consideration of the undertakings and agreements of Chamberlain, sells and conveys to him all its personal property of every name, kind and description, in the state of Wisconsin (except all such as is used on, and is appurtenant to the operation of the Watertown Division of the La Crosse and Milwaukee Railroad), of which an inventory shall be taken and attached so soon as the same can be conveniently done." "And the company, in consideration of the said undertakings and agreements of Chamberlain, leases and lets to him from and after the thirtieth day of September, 1857, for an indefinite term of time, to be determined in the manner specified, its entire railroad and railroad route from the city of Milwaukee, by way of Horicon and Portage City, to the city of La Crosse, together with its right of way, depot grounds, and all buildings, tenements and fixtures of whatever kind or description, connected therewith, or appurtenant thereto, together with all estate, rights, privileges, appurtenances and franchises connected therewith, or belonging or incident thereto, subject only to such prior or superior liens, as may or do exist thereon. Chamberlain shall operate so much of the road as is ready for operation, and from time to time such portions as shall be made ready for operation, in such manner as will produce the largest amount of net receipts. He shall keep the road and rolling stock in good thorough repair; and he shall receive and appropriate all the receipts or income derived from the operations of the road. If it shall be found for the interest of the company, he may purchase additional rolling stock, and appropriate the receipts of the road for its payment." It is then agreed that monthly accounts shall be rendered by Chamberlain, and that the officers of the company shall at any time have the right to examine his accounts. Then follows a statement of coupons of prior mortgages on the road, that are to be the first paid out of the net receipts of the road, and of the amount to be appropriated to the sinking fund; and the residue of the net receipts shall be applied by Chamberlain in payment of the amount due, or hereafter to become due to him, by virtue of the contracts, as specified in the agreement of this date, and also of this said agreement. And Chamberlain agrees that whenever he shall have received from the earnings of the road such sum as by the terms and conditions of the several contracts, (describing them,) he is, or shall be entitled to receive; or whenever the company shall pay him any balance he shall be entitled to, that he will surrender up to the company the quiet and peaceable possession of the whole premises in good repair, and all rolling stock and other personal property put on said road by him, and all personal property that shall not be worn out; and then the contract shall cease and determine. The bill prays that these contracts may be annulled as fraudulent; and that Chamberlain may be enjoined from further controlling or running the road, and for general relief.

The answer of the company alleges that the contracts or agreements were made with the sole view and design, on its part of vesting in Chamberlain the right of possession, enjoyment and use of all and singular the property, rights, privileges, franchises and emoluments therein mentioned, upon the terms therein expressed, for the purpose of securing the payment to Chamberlain of the several debts due and owing him by the company, and as a security and as a means of payment of a large sum of indebtedness then due and owing him. And it denies that the contract was made with a fraudulent intent. The answer of Chamberlain is very nearly a duplicate of that of the company, in this respect.

On the 2d day of October, 1857, and during the trial of the plaintiff's suit at law against this company, the company confessed a judgment to Chamberlain, in this court, for six hundred and twenty-nine thousand and eighty-nine dollars. It is alleged in the bill, that the company did not then owe him exceeding fifty thousand dollars; and that the judgment was confessed to hinder or delay creditors, and is fraudulent. The bill prays that the judgment be vacated.

Mr. Kilbourn, the president of the com-

pany, testified that he was present, and acted in the board when the judgment was confessed, and when the lease was given. Chamberlain was anxious for security for his debts; he thought he was incurring too large responsibilities on uncertainties. The company gave him assurances of security, as the great point with the company was the completion of the·road. As September and October approached, the company was getting deeper into embarrassments. An association of bondholders was threatening the company, and he saw but one way to save the road and secure its ultimate completion, which was to make the lease to Chamberlain. The board came to the same conclusion; and the lease was made. The only remaining hope for the continuance of the work on the road, seemed to be, to give Chamberlain such a lien on it as would assure the payment of what had already become due for the work then done, as well as for that to be done under the contract. This was the great and paramount danger which threatened to overwhelm ·the company; but there were other and nearer dangers threatening the company more immediately, against which it was equally necessary to guard. One or two attachments had been issued against ·the company, for a few hundred dollars, and it seemed quite evident that by such means the company's resources would soon be so exhausted as to render it entirely powerless for further progress. The floating debt of the company then amounted to $300,000 in small sums, which, if sued under the panic, would have effectually arrested the progress of the work, and prevented the completion of the road. At the time of giving the lease, the amount of indebtedness to Chamberlain was not known. It was the intention of the company to give him a perfect lien on the road and its earnings; to secure all indebtedness accrued and accruing under his contracts, until the whole amount should be paid; and such was one of the conditions of the lease, without reference to the specific amount. The amount of indebtedness at that time, or any other time, was not a necessary element of the lease. The reason why the judgment was ordered by the board, we understood to be, in consequence of a doubt entertained by the counsel of Chamberlain, whether more legal difficulties might not be raised, as to his lease lien covering the iron not laid down on the road; and to avoid all questions in that respect, and in part to render the transaction so regarded a lien, as perfect as possible; and to accomplish the ends proposed to be secured by it, it was deemed advisable by the board, under advice of counsel, to give the force of a judgment in support of the previous lien, for the amounts then reported to be due by the chief engineer, whose statement was considered conclusive by the company. Cleveland's suit was then pending. It was rather a hurrying time with the company. Other matters were pressing. Chamberlain first suggested the judgment. It had particular reference to the iron which Vose, Livingston & Co. were endeavoring to. reclaim. He wanted, · first, to secure the completion of the road; second, to secure the Wisconsin stockholders. In order to secure these objects, he deemed it necessary to give the lease and judgment before Cleveland got his judgment; ånd he explained his views to the board. The iron was to. be devoted to the use of the road, and Chamberlain was to have the use of the road to secure him. The agreement was understood to be, that the iron was to be laid on the road. So far as anything was said by Chamberlain, it was evident that his motive was to secure payment of the debts. due and accruing to him from the company. The judgment was for a specific amount then due, as reported by the chief engineer. The leading object of the directors was the completion of the road. The judgment was not in derogation of the lease, but to carry out its objects. There was no understanding, when Chamberlain proposed that the judgment should be given, that it should be used in any way inconsistent with the completion of the road. Probably Chamberlain's object in proposing the judgment was not only to protect himself against Vose, Livingston & Co., but also against Cleveland's claim. In our conversation with Chamberlain the principal matter talked of was his security. It was understood that he should go on with the work. The allowance of $200,000 to Chamberlain was not included in the judgment.

A great amount of testimony was submitted on this subject, and on the amount of indebtedness of the company to 'Chamberlain, which is not necessary to be here stated. The company is authorized by its charter "to make such covenants, contracts and agreements, as the execution and management of the work, and the convenience and interests of the company may require." And it is "empowered to borrow money at any rate of interest, and to make all necessary writings, notes, bonds, mortgages, or other papers and securities, in amount and kind as may be deemed expedient, or in discharge of any liabilities that it may incur in the construction, repair, equipment or running of said road." The lease to Chamberlain was intended as a security, in the kind or nature deemed expedient for liabilities incurred, and to be incurred, in the construction, repair, equipment and running of the road. The company, by virtue of the general powers vested in it as a corporation, has all the powers contained in this provision of the charter. It does not materially enlarge the general power of the grant to contract and be contracted with. It was not intended to embrace a contract for a transfer, or lease of all the franchises of the company for an unlimited term. The powers and privileges

granted to the company are in many respects unusual and extraordinary; but unless so expressed, public policy and the rights of creditors should exclude any such construction of the charter as to sanction this lease.

The law of the state empowers railroad companies to borrow money and to execute trust deeds, or mortgages, or both, on railroads constructed, or in process of construction, for the sums borrowed or owing, upon such terms and in such manner as the company shall deem expedient; and the company may make such provisions in the trust deed or mortgage for pledging or transferring their railroad track, right of way, depot grounds, rights, privileges, immunities, machine house, rolling stock, furniture, tools, implements, appendages, and appurtenances belonging to or used in connection with such railroad, in any manner whatever, as security for any bonds, debts or sums of money that may be secured by such trust deed or mortgage. And in case of the sale on such mortgages or trust deeds, the purchasers shall acquire and shall exercise and enjoy all and the same rights, privileges, grants, franchises, immunities and advantages in the mortgage, or trust deed enumerated and conveyed, as fully as the corporation, shareholders, officers and agents of the company might or could have done. And the purchasers may proceed to organize anew and elect directors, distribute and dispose of stock, take the same or another name, and may conduct their business generally under and in the manner provided in the charter, with such variations in manner and form of organization as their altered circumstances and better organization may seem to require; but not greater or enlarged powers shall be exercised by the new organization. These laws establish the policy of the state in regard to the power of railroad companies to mortgage their roads; and they relieve the court of all embarrassment on that subject. By the laws of this state, railroad companies and individuals are placed on an equality in respect to their mortgages.

The two agreements of the 26th September, 1857, must be considered as one. They are so intimately connected, that they might have been embraced in one agreement.

It is contended that the defeasance gives the agreement the character of a mortgage; but without it the company would have the equitable right to regain possession by discharging its liabilities to Chamberlain. Nugent v. Riley, 1 Metc. [Mass.] 117; Erskine v. Townsend, 2 Mass. 493; Hughes v. Edwards, 9 Wheat. [22 U. S.] 489; 1 White & T. Lead. Cas. 510; Hil. Mortg. 22; Conway v. Alexander, 7 Cranch [11 U. S.] 218; Morris v. Nixon, 1 How. [42 U. S.] 118; Russell v. Southerd, 12 How. [53 U. S.] 139; Sprigg v. Bank, 14 Pet. [39 U. S.] 201; Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386; Redf. R. R. 584, 585, and cases cited.

A court of equity will look to the substantial object of the conveyance, and will consider an absolute deed a mortgage whenever it is shown to have been intended merely as a security for the payment of a debt; and the grantee may maintain a bill to foreclose the equity of the grantor. But Chamberlain could not proceed in equity to foreclose on this agreement, if he had not been placed in possession. I apprehend his remedy would then have been at law upon the contract. It was not given nor received as a security for money borrowed; but as a security for a debt accruing and to accrue, with a transfer of possession of the premises. If possession had not been delivered to Chamberlain, I know of no means he had for enforcing a foreclosure, or acquiring possession. But being placed in possession he may be proceeded against by a bill at the suit of the company to redeem, and for an account. Technically this agreement is not a mortgage. It is an assignment to a preferred creditor, with a lease for the mutual interest of the parties. If this were a mere assignment of a part of the property of the company, it might, if bona fide, be adjudged as a mortgage of the property transferred, so that the residuary interest of the grantor may be reached by execution, or by a bill in equity, as in Leitch v. Hollister, 4 Comst. [N. Y.] 211. A debtor has a right to prefer one creditor to another in payment; and his private motives for giving the preference cannot affect the exercise of the right, if the preferred creditor has done nothing improper to procure it; but any unlawful consideration moving from the preferred creditor, to induce the preference, will avoid the deed which gives it. Marbery v. Brooks, 7 Wheat. [20 U. S.] 556. And it is no object to such an assignment that it defeats other creditors of their legal remedies. Brooks v. Marbery, 11 Wheat. [24 U. S.] 223. A debtor may lawfully apply his property to the payment of the debts of such creditors as he may choose to prefer; and he may select the time for doing it, so as to make it effectual. Such preference must necessarily operate to the prejudice of creditors not provided for, and cannot furnish any evidence of fraudulent intention. And such assignments may be made direct to the creditor. Tompkins v. Hughes, 10 Pet. [35 U. S.] 106. It is not a legal objection to this agreement as an assignment, that it was made during the trial of the plaintiff's cause against the company, and before judgment was rendered. So long as a person or corporation is the owner of property unincumbered, an assignment may be made for the payment of debts, giving preferences where there is no statute law prohibiting it, as in this state. But where fraud is alleged, the time, the occasion, and the inducement for making the assignment are proper subjects for consideration.

Under the pecuniary embarrassments of

the company, the assignment was made to Chamberlain, as a security for a debt partly accrued and partly to accrue, in building the road to New Lisbon. The whole road from Milwaukee to La Crosse is embraced in the lease, while a great portion of it was not then completed. There is no doubt, from the testimony of the witness, and from the face of the agreement, that the intent of the parties was to prevent the creditors of the company from further interfering with, or interrupting its operations. Chamberlain obtained a preference over other creditors, for a debt then existing; and he acquired possession of the whole property of the company, with which to carry on the business of the company. And while increasing the amount of his debt against the company, he enjoys the exclusive possession and control of its property for an indefinite period of time; subject to the duty of rendering an account semi-annually, showing his balance against the company, on which he draws interest at the rate of twelve per cent. per annum. In operating the road and in supplying rolling stock; at his discretion, he is substituted for the directory of the company. For an indefinite period of time he is the company for all practical purposes.

Assignments of insolvent debtors, giving unlimited discretion to the assignee, cannot be sustained against creditors. Assignments must be absolute and specific in their directions and not coupled with trusts not authorized by law. 7 Paige, 568; Boardman v. Halliday, 10 Paige, 223. Nor can such an assignment be used as a device to continue the business of the assignor uninterrupted by his creditors. Owen v. Body, 5 Adol. & E. 28; American Exch. Bank v. Inloes, 7 Md. 380. And a debtor cannot make a reservation at the expense of his creditors, of any part of his income or property, for his own benefit; nor can he stipulate for any advantage to himself. Green v. Trieber, 3 Md. 11. Assignment must be made in good faith, for the purpose of paying debts, and without any intent to lock up the property from other creditors for the use of the debtor. A conveyance of the owner in trust for himself, is in effect a conveyance to himself; and the grantor in such deed can have but one motive, and that must be to hinder or delay the claims of creditors. The law does not tolerate any hinderance in assignments for the benefit of creditors, beyond what may be necessary for the purpose of the assignment. And any stipulation in a deed, which materially hinders or delays the rights of creditors, renders it void. A deed of assignment authorizing the assignee to sell the assigned property on credit, is void as to creditors, on account of the delay. Barney v. Griffin, 2 Comst. [N. Y.] 365. A transfer of property, which creates a trust, whether secret or avowed, in favor of the grantor, renders the transaction fraudulent and void in legal con-

templation, even though there may be mingled with it provisions in favor of preferred creditors. Shaffer v. Watkins, 7 Watts & S. 219. In the case under consideration the time for executing the assignment is unlimited; to be terminated only by the payment of the assignee's accrued and accruing debt by the insolvent company, or out of the avails and proceeds of the property and business of the company. The whole profits, beneficial interest, enjoyment and control of the road and property of the company passes to this preferred creditor, with powers to manage and run the road, and to purchase additional stock at his discretion. The direct tendency as well as the avowed paramount object, was to carry on the business of the company, and to pay the assignee and preferred creditor out of the profits. The cases of Arthur v. Commercial & Railroad Bank of Vicksburg, 9 Smedes & M. 394, and Bradley v. Goodrich, 7 How. [48 U. S.] 276, are irresistible authorities for determining this case against the defendant Chamberlain. The commercial and Railroad Bank of Vicksburg assigned all its property to trustees, reciting that "the embarrassed situation of the bank and the present inability of its debtors to meet the liabilities and by consequence, that the bank was unable to pay its debts promptly, rendered it necessary that a general assignment should be made for the benefit of its creditors and the completion of the railroad;" it therefore assigned all its property to trustees, with authority to sell the effects assigned, to collect all debts due to the institution and to complete the railroad, for which they were authorized to borrow a sum not exceeding $250,000; and out of the proceeds collected, to pay the principal and interest of the loan. After that dividends were to be made pro rata among the creditors; the trustees to receive eight thousand dollars each per annum for their services. The supreme court of the United States decided "that the deed was fraudulent and void as against creditors of the bank; that the deed showed on its face an intention of the bank to postpone its creditors, use the effects of the bank for the completion of the railroad, pay the trustees enormous salaries, and make no dividends among the creditors until the object was accomplished." The deed in that case made some show of regard for the rights of creditors, but the deed in this case only contemplates a benefit to the parties, the insolvent assignor, and the preferred assignee. How much salary was allowed Chamberlain in the $200,000 is not specified, but from the recklessness exhibited on the part of the directors, it may be presumed to be enormous. The whole recital of items comprising that amount strikes me as extraordinary and enormous after Chamberlain's original contract price for building the road had been extravagantly enhanced, and while he had

in his hands funds of the company amounting to nearly $150,000 which the directors did not require to be accounted for or applied. And it is questionable whether, under the circumstances, Chamberlain was entitled to any damages for the temporary suspension of the work west of New Berlin. The principles here stated apply to assignments direct to a preferred creditor, as well as to those in trust for creditors. McClurg v. Lecky, 3 Pen. & W. 83; Passmore v. Eldridge, 12 Serg. & R. 198. The assignment and lease to Chamberlain will be decreed to be void as against this complainant.

The defendant Chamberlain in his answer denies that the judgment confessed by the company in his favor was based on any fictitious consideration, or was given and accepted with any intent or design to hinder or delay or defraud the creditors of the company; but on the contrary, he says that it was given for effectual indebtedness from the company to him. And he claims the amount of work done for the company under his contracts exceeds the amount of the judgment. In the testimony of the witnesses there is very great discrepancy as to the amount of work done, and also as to the prices that should be paid. One thing, however, is beyond dispute; that the amount included in the judgment far exceeds the amount he would be entitled to on his original contract. The company might increase his compensation within reasonable bounds without incurring the imputation of fraud. In pursuance of the agreement between Chamberlain and the company in the month of December, 1857, for re-measuring the work, for the purpose of ascertaining the amount due him on the 1st of October, 1857, a survey and estimate were made, which showed an amount greater than that of the judgment. If that survey and estimate had been made on notice to the complainant, more reliance could be placed on the evidence upon that subject. Neither that survey nor the one for the complainant can be accurate, on account of the length of time the work had been done. Chamberlain may not be entitled to anything near the amount of the judgment. But liberality on the part of the company should not be considered fraudulent, unless it be so excessive as to bring the mind to that conclusion, after an examination into all the circumstances. This is not a suit of Chamberlain against the company on the contracts, requiring a legal enquiry into the amount due him; but the only question for our consideration is whether the judgment is fraudulent as against creditors. The judgment was confessed a few days after the assignment, while the company was laboring under its pecuniary embarrassments. The testimony of Mr. Kilbourn is, "that the judgment was suggested by Chamberlain and his counsel. That it had particular reference to the iron Vose, Livingston & Co. were endeavoring to reclaim. The completion of the road first, and securing Chamberlain, were the objects of the company, and they deem it necessary to give the lease and the judgment before Cleveland should get a judgment. The judgment was not in derogation of the lease, but to carry out the object of the lease. Probably Chamberlain's object in proposing the judgment was not only to protect himself against Vose, Livingston & Co., but also against Cleveland's claim."

The confession of a judgment to a bona fide creditor, even though it have the effect of giving him a preference over other creditors, is not a fraudulent disposition of an insolvent estate. While there is no statute prohibiting it, an insolvent debtor, has a right to give preference to his creditors by confessing judgments. But if such judgments are given and received for the purpose of hindering or delaying creditors, they are voidable as against those creditors if even for a bona fide debt, and if not used for that purpose. When a judgment is given and received for a fraudulent purpose, the giving judgment is such an act done in pursuance of the fraudulent purpose, as to render it voidable by any person who is in a position as a creditor, to question it. And such a judgment originally given for the purpose of defrauding creditors, cannot even be used as against such creditors to collect the amount due to the party to whom it was given. Bunn v. Ahl, 5 Casey [29 Pa. St.] 387. If Chamberlain had merely demanded and received the judgment, even to the known delay of Cleveland and the other pressing creditors of the company, it would not be legally invalid as against them. But would the judgment have been demanded and given, after the assignment and lease, but for the purpose of forestalling Vose, Livingston & Co., in reclaiming the iron, which the interests of Chamberlain and the company required should be laid on the track of the road; or to further the paramount object of the assignment and lease? The suits of Vose, Livingston & Co., respecting the iron, and the two contracts of settlement between them and Chamberlain and the company, show that they were pressing a claim for the iron, which was compromised by those contracts. So far it appears that Vose, Livingston & Co. had a claim, to effect which the judgment was demanded. But be this as it may, it appears satisfactorily that the judgment was given and received as a part of the arrangements to secure the future operations of the company and Chamberlain, in the prosecution of the work towards completion, while the creditors of the company should be hindered or delayed for an indefinite time; and it must fall under the same condemnation as the assignment and lease.

The assignment and lease to D. C. Freeman, of the Milwaukee and Watertown Division, having expired by its own limitation,

it is not necessary to make any decree against him, except that he pay his share of the costs.

The plaintiff is left now to pursue his legal remedies against the company on his execution.