## Case No. 14,375.

### UNION NAT. BANK v. DOUGLASS.

[1 McCrary, 86.][1]

Circuit Court, D Iowa. 1877.

CORPORATION—CAPITAL STOCK—RIGHT OF CREDITOR TO FOLLOW PROPERTY OF CORPORATION—DIRECTOR—STOCKHOLDER.

1. The capital stock, property and assets of a corporation are to be deemed a trust fund sacredly pledged for the payment of the debts of the corporation.

2. Equity recognizes the right of a creditor of a corporation to pursue the property of the corporation into whose possession soever it may be transferred, unless it has passed into the hands of a bona fide purchaser. Stockholders are not entitled to any share of the capital stock nor any profits until the debts of the corporation are all paid.

3. Where a director, who was also a stockholder, of an indebted corporation, as director aided in the passage of a resolution by which, as stockholder, he appropriated certain bonds which were assets of the corporation to his own use,—held, that he was liable to the creditors, as trustee, for the value of such bonds

At the May term of this court the plaintiff recovered judgment against the Missouri & Iowa Construction Company for the sum of $23,914.28. Upon this judgment an execution was returned unsatisfied. Demand was made upon the officers of the corporation to disclose and turn out property. These officers failed and refused to turn out property or show any from which satisfaction could be obtained. It is alleged that the defendant was a holder of fifty shares of stock of $1,000 each, of which sixty per cent. only had been paid. And it is averred that the sum of $6,000 is due on said stock. The petition alleges that defendant was concerned with other stockholders in the diversion of the funds of the company and in the payment of dividends, whereby defendant received $20,000, etc. The answer admits that the defendant is a stockholder to the amount of twenty shares, but denies that there remains unpaid and subject to payment of plaintiff's judgment an amount sufficient to pay off and discharge said judgment, but on the contrary avers that the whole amount of said

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]

stock has been paid, and that he is not indebted in any sum whatever to said construction company. Resolutions of the board of directors, of whom [George] Douglass was one, date of June 30, 1873, authorizing the president and treasurer to make an allotment of bonds of the St. Louis, Hannibal & Keokuk R. R. Co. to the stockholders of this company who had paid up all assessments theretofore made at the rate of $1,000 in bonds for each $600 paid in on stock, and at same rate on any new subscription or future assessments as the same are paid; but in order to equalize the payment on old and new subscriptions, and in payment of interest to the original subscribers, the allotment of bonds to them on all subscriptions made prior to January 1, 1873, shall be at the rate of $1,000 in bonds for each $500 paid in on assessments heretofore called in; also that the first three coupons from all of said bonds before they are given out, and that the receipt to be given by the stockholders for said bonds shall contain an agreement that said bonds shall not be offered for sale at less than ninety cents on the dollar without the consent of the president, etc., of the St. L., H. & K. R. R. Also, that an allotment of stock of the St. L., H. & K. R. R. be made to the stockholders of this company, at the rate of eight shares of stock with each one thousand dollar bond, as herein provided. Also, that said president and treasurer be authorized to cancel the remaining unpaid subscriptions of any subscribers who choose to have them so cancelled, on condition that the allotment of bonds to such subscribers shall be at the rate of $1,000 in bonds for each $600 paid in on stock. At another meeting of directors, at Cedar Rapids, August 7, 1875, it was resolved that an assessment of thirty per cent. on the capital stock of the company should be called in, payable as follows, viz.: Ten per cent. on the 1st day of October next; ten per cent. the 1st day of November next; ten per cent. the 1st day of December next. Another resolution, moved by Wisner and seconded by Douglass, was adopted, as follows: "Whereas, this company, by a resolution adopted June 30, 1873, provided for the allotment of stocks and bonds of the St. L., H. & K. R. R. Co. to the subscribers of this company; and, whereas, allotments were made under said resolution; and, whereas, it has been evident that this company cannot procure the means and materials to furnish said road unless said bonds are returned to this company; now, therefore, resolved, that the treasurer is hereby authorized to receive from the stockholders who desire it, the first mortgage bonds of the said St. L., H. & K. R. R., at thirty-seven and one-half cents on the dollar, in payment of said assessment, and stockholders who desire are permitted to pay up the whole thirty per cent. at any time in advance of its becoming due." The secretary of the company, Mr. Buchanan, testifies that the credit of $6,000

upon the company's books to Douglass was for bonds returned under this resolution. Buchanan further says that the indebtedness of the construction company, June 30, 1873, was about $56,771.11, and this includes the notes payable to H. G. Angle, due in May or April, 1874, upon which the judgment referred to above was founded, and that he knew of no assets that the company had aside from the unpaid stock and work they had done on the railroad in Missouri, except $12,500 of bonds due the company from Lincoln county, Missouri. Also, that the work done on the road in Missouri amounted to $581.215.83. This witness also testified that the construction company owes in the aggregate $175,559.66; that is, at the time B.'s deposition was taken, exclusive of Blair's claim for iron for thirteen miles of the road. Blair's claim is $21,071.64, which added to $175,559.66, gives total of indebtedness. Douglass returned his bonds at thirty-seven and one-half cents on the dollar. Sixteen thousand dollars in bonds were returned by defendant at thirty-seven and one-half cents on the dollar. The bonds were worth fifty cents when allotment was made. Bonds to the amount of $394,000 were alloted under the resolution of 1873.

Nourse & Kauffman, for plaintiff.
Hubbard & Deacon, for defendant.

LOVE, District Judge. No doctrine of equity is more firmly established upon solid foundations of reason and authority, than the principle that the capital stock, property and assets of a corporation are to be deemed a trust fund sacredly pledged for the payment of the debts of the corporation. This doctrine was most forcibly expounded by Judge Story in the case of Wood v. Dummer [Case No. 17,944]. That case grew out of the insolvency of the Halowell and Augusta Bank, in which the defendant, a stockholder, withdrew from the bank his proportion of stock, when the bank was indebted on bills previously issued. Judge Story, among other things, said that he "viewed the stockholders as having the full benefit of the profits made by the establishment. and as being unable to take any portion of the fund until all the other claims on it were extinguished, and that their rights were not to the capital stock, but to the residuum, after all demands were paid; and further, that upon a dissolution of the corporation. although the billholders and stockholders had each equitable claims, yet those of the billholders had the prior equity. On the principle, then," he continued, "that the capital stock was a trust fund, it was clear that it might be followed by creditors into the hands of any person having notice of the trust attached to it, and that as to the stockholders themselves there could be no pretense to say that in law and in fact they were not affected by the most ample notice." Judge Story laid down the same doctrine in Mumma v. Potomac Co., 8 Pet. [33 U. S.] 286.

In Curran v. State of Arkansas, reported in 15 How. [56 U. S.] 304, the supreme court of the United States held that on the dissolution of corporations its effects are a trust fund for the payment of its creditors, who may follow them into the hands of any one not a bona fide creditor or purchaser, without notice; and a state law which deprives creditors of this right, and appropriates the property to other uses, impairs the obligation of their contracts and is invalid; and the fact that a state is the sole owner of the stock of a corporation does not affect the rights of its creditors. And Judge Curtis, in delivering the opinion in this case, quotes with approbation from Story's Equity the following language: "To this head of implied trusts we may refer that class of cases where the stock and other property of private corporations is deemed a trust fund for the payment of the debts of the corporation, so that the creditors have a lien or right of priority of payment on it in preference to any of the stockholders of the corporation; and no stockholder can entitle himself to any dividend or share of such capital stock until all the debts are paid; and if the capital stock should be divided, leaving any debts unpaid, every stockholder receiving his share would, in equity, be held liable pro rata to contribution to discharge such debts out of the funds in his hands." And Judge Curtis adds, that in conformity with this doctrine the following cases were decided in the state courts: Wright v. Petrie, 1 Smedes & M. Ch. 319; Nevit v. Bank of Port Gibson, 6 Smedes & M. Ch. 513; Hightower v. Thornton, 8 Ga. 493; Nathan v. Whitlock, 3 Edw. Ch. 215, affirmed by the chancellor in 9 Paige, 152.

In Nathan v. Whitlock, 9 Paige, 152, the case was that the directors of an insurance company agreed among themselves to take a majority of the stock and to give their stock notes for the same. secured by an hypothecation of the stock, and after the company had become embarrassed, one of the directors agreed with the president to give him $6,000 if he would take his stock and substitute his own note in lieu of the stock note of the director, which was accordingly done. It was held to be a fraud upon the creditors of the company and the other stockholders who had paid their stock. and an action was sustained against the director upon the note delivered up. The court held that in all cases where the capital stock or assets of a corporation have been distributed to the stockholders without providing for the payment of the debts, a court of equity will allow the creditor to sustain a bill against the shareholders to compel contribution to the payment of the debts of the company to the extent of the funds obtained by them. whether directly from the company or through some substitution of useless securities for those that were good.

In Sawyer v. Hoag, 17 Wall. [84 U. S.] 610, the court said: "A nominal payment by stockholders is no payment as to creditors." Again, in Sanger v. Upton [91 U. S. 56], the supreme court of the United States held that: "A resolution or agreement that no further calls be made is void as to creditors, and an agreement that stockholders may pay in any other medium than money, is void as a fraud upon other stockholders and upon creditors." And further, that "the capital stock of an incorporated company is a fund set apart for the payment of debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied otherwise than upon their demands until such demands are satisfied. The creditors have a lien upon it in equity. If diverted they may follow it as far as it can be traced, and subject it to the payment of their claims, etc. Unpaid stock is as much a part of this pledge and as much a part of the assets of the company as the cash which has been paid in upon it." But perhaps the strongest application of this doctrine is to be found in the Railroad Co. v. Howard, reported in 7 Wall. [74 U. S.] 392. It will be remembered that in that case, which was a railroad foreclosure, it was quite manifest, and in fact not denied, that mortgaged property was wholly insufficient to pay the bonded debts, and that, in fact, upon a regular foreclosure there would have been nothing whatever to apply in payment of the general and unsecured creditors. The Chicago & Rock Island Railway Company proposed to purchase the mortgaged property for the sum of $5,500,000, if the title could be obtained without delay, so as to enable them to prosecute the building of the road speedily and secure a land grant which might otherwise be lost. As this was a proposition exceedingly favorable to the interests of the mortgage bondholders, they, in order to allay the apprehended opposition of the stockholders to a foreclosure, entered into an agreement to abate a certain percentage from their respective claims, in order to set aside sixteen per cent. of the purchase money for the benefit of the stockholders. The foreclosure and sale having been accomplished, the general or unsecured creditors came into equity and claimed as against the stockholders the fund arising from this sixteen per cent., and this court held without hesitation that the general creditors were entitled to that fund. Upon appeal, it was contended in the supreme court that there was no pretense of fraud as against the stockholders, and that the substantial rights of the general creditors were not in the slightest degree affected, since it was admitted that the mortgaged property was insufficient to pay the secured creditors, and that the sixteen per cent. fund resulted solely from their voluntary agreement to abate in favor of the stockholders a part of what they had a perfect right to demand and appropriate as against the general creditors. The supreme court, however, without dissent, affirmed the decree below. And Judge Clifford, speaking for the whole court, said that "Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation, and recognizes the right of creditors to pursue it into whosesoever possession it may be transferred, unless it has passed into the hands of a bona fide purchaser; and the rule is well settled that the stockholders are not entitled to any share of the capital stock, nor any dividend of the profits, until all the debts of the corporation are paid." The Code of 1873, § 1072, provides that "the payment of dividends that leave insufficient funds to meet the liabilities of the corporation shall be deemed such a fraud as will subject those therein concerned to the penalties of the preceding section, and such dividends, or their equivalents in the hands of individual stockholders, shall be subject to such liabilities." As to the remedy here adopted, see 40 Iowa, 650; Code, §§ 1082–1084.

The defendant in the case now before the court was both a director and stockholder of the indebted corporation. As a director he aided in the passage of a resolution by which, as a stockholder, he appropriated the bonds in question, which were assets of the company, in a certain proportion to his paid up stock. This was a wrongful act on his part. It resulted in diverting to his own use a part of the trust property which he as a trustee was bound to apply to the payment of debts. This he had no right to do, so long as the debts remained unpaid. The diversion of the trust fund was a breach of trust and a fraud upon creditors. As against the creditors he thereby acquired no title to the bonds in question. A trustee can certainly acquire no title to any part of the trust fund for his own use by a breach of trust and a fraud upon creditors. The defendant, notwithstanding the transfer of bonds to himself, stood seized of them, subject to the trust in favor of creditors. The creditors had a perfect right to pursue the bonds in the hands of the defendant, and have them applied in payment of their claims against the corporation. This defendant, in the next place, as a director of the corporation, assisted in the passage of a resolution by which an assessment was made of thirty per cent. upon the capital stock of the company, and another resolution, providing that the treasurer should be authorized to receive from him and others, in payment of this assessment, the very bonds which they had wrongfully appropriated. The defendant did not own the bonds with which he paid up his stock. These bonds were the property of the corporation, in trust for the creditors. The defendant paid what he owed the corporation by the delivery of bonds which belonged to them. He gave to the

company, and to the creditors through them, in payment, a part of the company's own assets—bonds to which he had in equity no title whatever; and this he now pleads as payment. It may be presumed that any delinquent debtor would not fail to pay his debts, if his creditors would furnish the means to do it with. Such a course of dealing would soon bring about a business millenium —a state of absolute freedom from all indebtedness. Now there certainly can be no doubt that the creditors of a corporation are entitled to have the whole of the assets of the company applied to the payment of their debts, and not merely some part thereof. In the present case both the bonds and unpaid stock were assets. The bonds were the result of work which the construction company had done for the railroad company. The money resulting from the paid up stock had been expended in the work, and took the form of bonds. The bonds were beyond question assets, and so was the unpaid stock. Now what did the creditors get by the transaction in question? Did they get both the stock and bonds applied to the payment of their claims? Clearly not. They got the bonds only. The unpaid stock was extinguished by the delivery of the bonds. In other words, the stock was paid with the bonds, and nothing was realized from the unpaid stock except what the company had before, namely, the bonds. It is precisely as if this defendant, by a resolution of his own, had taken cash from the company's treasury, and immediately paid it back in liquidation of his assessment. Suppose the sixty per cent. which had been paid by the stockholders upon previous assessments had remained in money in the treasury, and suppose the directors had ordered the treasurer to deliver of this money so much to the stockholders as would be sufficient to pay the thirty per cent. assessment. What would equity have said to such a transaction? The result of such a transaction would clearly have been the extinguishment of ninety per cent. of the stock by the payment of sixty per cent. In other words, the thirty per cent. assessment would have been paid with the company's own money. It is said that the company was solvent when the allotment of bonds was made. If so, the allotment must have resulted in the insolvency of the corporation, since we find that debts exist, amounting to $196,631.30, for which no provision seems to be made. Such an argument is suicidal. It kills itself. Surely if the law permitted the stockholders of a corporation to pay up their stock, and then appropriate an equal amount of the assets before the payment of debts, it would open the way to the universal insolvency of corporations! Such a doctrine would give absolute impunity to fraud upon the creditors of corporations, and utterly discredit them in the financial world. The truth is that it makes no difference whatever whether a corporation is solvent or insolvent, so far as the doctrine is concerned that the property is a trust fund which cannot be withdrawn or appropriated by the stockholders until the debts are paid. Judgment for plaintiff.